SCHENLEY INDUSTRIES, INC., A CORPORATION, SUCCESSOR BY MERGER TO PARK & TILFORD DISTILLERS CORPORATION, SUCCESSOR BY MERGER TO PARK & TILFORD IMPORT CORPORATION, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 40964–40967.   Filed April 15, 1964.

*Jacquin D. Bierman*, for the petitioners.
*Arthur N. Mindling*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies and petitioners claimed overpayments in the respective dockets for the years and in the amounts as follows:

*Schenley Industries, Inc., a Corporation, Successor by Merger to Park & Tilford Distillers Corporation, Successor by Merger to Park & Tilford Import Corporation*

DOCKET NO. 40964

| Calendar year | Deficiencies | Petitioner's claimed over-payments |
|---|---|---|
| 1940 | | $64,614.20 |
| 1941 | | 209,258.47 |
| 1942 | $112,878.29 | 900,221.10 |
| 1943 | 151,056.30 | 674,300.70 |
| 1944 | | 434,354.97 |
| 1945 | | 294,827.08 |

[1] Proceedings of the following petitioners are consolidated herewith: Bonnie Bros., and Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corp., Formerly Park & Tilford, Inc., Sole Stockholder at Time of Dissolution of Bonnie Bros., docket No. 40965; Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corp., Successor by Merger to Park & Tilford Distillers, Inc., docket No. 40966; and Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corp., Successor by Merger to Park & Tilford Distillers, Inc., Successor through Consolidation to Park & Tilford Distillery, Inc., docket No. 40967.

*Bonnie Bros., and Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corporation, Formerly Park & Tilford, Inc., Sole Stockholder at Time of Dissolution of Bonnie Bros.*

DOCKET NO. 40965

| Calendar year | Deficiencies | Petitioner's claimed over-payments |
|---|---|---|
| 1941 | $9,423.27 | $9,423.27 |
| 1942 | 35,761.32 | 35,761.32 |

*Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corporation, Successor by Merger to Park & Tilford Distillers, Inc.*

DOCKET NO. 40966

| Calendar year | Deficiencies | Petitioner's claimed over-payments |
|---|---|---|
| 1940 | | $16,706.84 |
| 1941 | | 124,393.79 |
| 1942 | $84,432.11 | 255,855.17 |
| 1943 | | 12,449.20 |
| 1944 | | 287,317.98 |
| 1945 | | 238,366.73 |

*Schenley Industries, Inc., Successor by Merger to Park & Tilford Distillers Corporation, Successor by Merger to Park & Tilford Distillers, Inc., Successor through Consolidation to Park & Tilford Distillery, Inc.*

| Calendar year | Deficiencies | Petitioner's claimed over-payments |
|---|---|---|
| 1942 | $63,875.91 | $63,875.91 |
| 1943 | 146,396.36 | 146,396.36 |
| 1945 | 141,058.80 | 141,058.80 |

The issues for decision are as follows:

 Whether Park & Tilford Import Corp. is entitled to relief under the provisions of section 722(a), section 722(b)(2), and section 722(b)(4) of the Internal Revenue Code of 1939;[2]

 Whether Park & Tilford Distillers, Inc., is entitled to relief under the provisions of section 722(a) and section 722(b)(4);

 Whether this Court has jurisdiction to consider Bonnie Bros.' applications for relief and claims for refund under section 722.

If we have jurisdiction, whether Bonnie Bros. is entitled to relief under the provisions of section 722(a), 722(b)(4), or 722(b)(5); and

 Whether Park & Tilford Distillery, Inc., is entitled to relief under the provisions of sections 722(a) and 722(c)(1) and (3).

### FINDINGS OF FACT

Some of the facts have been stipulated and are hereby found as stipulated.

---

[2] All references are to the Internal Revenue Code of 1939.

Schenley Industries, Inc., is the successor in interest to Park & Tilford Distillers Corp., the original petitioner. Park & Tilford Distillers Corp. was the successor in interest to Park & Tilford Import Corp. (hereinafter referred to as Import), docket No. 40964, Park & Tilford Distillers, Inc. (hereinafter referred to as Distillers), docket No. 40966, Park & Tilford Distillery, Inc. (hereinafter referred to as Distillery), docket No. 40967, and was the sole stockholder of Bonnie Bros. (hereinafter referred to as Bonnie) at the time of Bonnie's dissolution. Bonnie is a petitioner in docket No. 40965. During the taxable years, Import, Distillers, Distillery, and Bonnie filed timely Federal income and excess profits tax returns with the district director of internal revenue, Upper Manhattan District, New York, on the basis of a calendar year, using an accrual basis of accounting.

Prior to June 30, 1950, the corporate name of Park & Tilford Distillers Corp. was Park & Tilford, Inc. (hereinafter referred to as P&T, Inc.). P&T, Inc., was organized on August 6, 1923, in the State of Delaware, P&T, Inc., was a holding company and conducted no operations of its own.

Import was incorporated on May 8, 1933, in the State of New York. During the taxable years here involved, the business of Import consisted of buying, selling, and distributing domestic and imported whiskies, rums, gins, wines, and brandies.

Distillers was incorporated on December 20, 1933, in the State of New York. During the years here involved, Distillers was in the business of buying, blending, rectifying, bottling, and selling domestic whiskies, gins, and brandies. It also bottled some wines. It produced gin through a process involving the redistillation of neutral spirits, as well as through rectification.

Bonnie was incorporated September 27, 1938, under the laws of the State of Kentucky under the name of Parkford Distillers, Inc., to acquire and hold for aging and sale 9,021 barrels of bulk whisky. On October 10, 1938, the name of Parkford Distillers, Inc., was changed formally to Bonnie Bros.

Distillery was incorporated September 6, 1940, in the Commonwealth of Pennsylvania. It engaged in distilling, blending, rectifying, bottling, and warehousing activities.

On September 27, 1938, Parkway Distillery, Inc., was incorporated in the State of Kentucky. On October 10, 1938, the name of the company was changed to Park & Tilford Distillers of Kentucky (hereinafter referred to as Kentucky). During the years here involved, Kentucky was engaged in distilling and warehousing whisky.

Park and Tilford (hereinafter referred to as P&T) was incorporated under the laws of the State of New York on June 1, 1906, as the successor to a New Jersey corporation which had been organized in

1890. During the years here involved, this company was engaged in the manufacture and distribution of cosmetics, perfumes, some drug sundries, and Tintex household dyes.

Park & Tilford Import Corp. of Missouri (hereinafter referred to as Missouri) was organized under the laws of the State of Missouri on September 2, 1937. During the years here involved, it was engaged exclusively as the selling agent of Import in distributing whisky in the State of Missouri.

From the dates of their respective organization and throughout the taxable years involved herein, P&T, Inc., was the sole stockholder of Import, Distillers, Distillery, Bonnie,[3] Kentucky, and Missouri. (These companies will sometimes hereinafter be referred to as the P&T Group.) During these years P&T, Inc., was also the sole stockholder of P&T.

Timely applications for relief and claims for refund pursuant to section 722 were filed by Import, Distillers, Distillery, and Bonnie. These are the only companies that have claims for relief under section 722.

Throughout the years involved herein, David A. Schulte (hereinafter referred to as Schulte), Gordon Stewart (hereinafter referred to as Stewart),[4] Frank G. Handren (hereinafter referred to as Handren), and Henry C. Bernard (hereinafter referred to as Bernard) were the executive officers of P&T, Inc., P&T, Import, Kentucky, and Bonnie.

The payment of officers' salaries during the years here involved was not made by each of the companies for which the officer worked. The salaries of Stewart and Handren were paid only by Import. The salaries of Schulte and Bernard were paid by P&T. Although Schulte held the office of chairman of the board of P&T, Inc., throughout the years 1933 to 1945, inclusive, and also held other offices from time to time, the present record indicates that he drew no compensation from any of the Park & Tilford companies in any year prior to 1940, with the sole exception of the year 1936. He drew a salary of $15,000 from P&T in 1940 and 1941 but the record is not clear as to whether or not he continued to draw a salary thereafter. A major change in the accounting treatment accorded to officers' salaries was instituted in 1942. After this change the aggregate amounts expended for officers' salaries by all the Park & Tilford companies were grouped with certain other common expenses and allocated to individual companies upon the basis of outside sales for the prior year.

In 1940, all of the companies in the P&T Group adopted a consolidated plan for bonus compensation.

---

[3] Bonnie was liquidated and dissolved on July 28, 1943.
[4] Stewart died Jan. 31, 1937.

The books and records for all of the companies during the years here involved were kept in one centralized accounting office at 485 Fifth Avenue, New York City.

With the exception of bottled-in-bond whisky described below, during the base period years, Import purchased all of its bottled domestic whisky from Distillers. The price of such purchase of Distillers' entire output to Import was at cost to Distillers plus 5 percent. For this purpose, such cost did not include State excise taxes. The sales price for any given month was based on Distillers' cost of 2 months previous to billing date, e.g., Distillers' cost of October 1939 was the basis for billing December 1939 sales. With the same exception for bottled-in-bond whisky, Distillers sold its bottled products exclusively to Import. Beginning with 1939 Distillers sold bottled-in-bond whisky which was bottled for its account by Frankfort Distilleries, Inc. (hereinafter referred to as Frankfort), to Kentucky for resale to Import and Missouri. All of Missouri's purchases of domestic bottled whisky were made from Import at cost plus 5 percent except that, for 1939, purchases of bottled-in-bond whisky were made from Kentucky at cost plus 5 percent. Sales to Kentucky were at Distillers' cost plus 5 percent and sales to Import and Missouri were at Kentucky's cost plus 5 percent. Beginning with 1939 Import purchased all its bottled-in-bond whisky from Kentucky. The specific policy adopted by all of the companies comprising the P&T Group was that bottled goods were transferred at cost plus 5 percent. The books of the companies reflected this policy as to cost.

At all times up through the year 1943, all transfers of bulk whisky between members of the P&T Group were made at cost. Such transfers were not put through the sales accounts. Although the inventory of bulk whisky at any date was owned by various members of the P&T Group, all of the inventories were treated as one reservoir and not shown by specific corporate ownership for management purposes. Handren never knew which company owned the bulk whisky because, under the method of operation, such knowledge was not needed. The only reason why bulk whisky was owned by one company in the P&T Group rather than another during the base period was because that particular company had funds available. It made no difference which company owned the bulk whisky. Import had a call on all the bulk whisky owned by the P&T Group, at cost, at any time that it was needed for its sales program.

The purchases of the distilleries and whisky acquired by Kentucky, Distillery, and Bonnie were accomplished through the use of P&T funds. At times, it became necessary for P&T to borrow funds in substantial sums from other Park & Tilford companies.

Only $500 each was paid in for capital stock of Distillery, Bonnie, and Kentucky by P&T, Inc.

Distillery acquired and operated the Hamburger plant at Brownsville, Pa., as a separate corporation; however, the purchase contract for the property was executed by Distillers. The money for the purchase was furnished by P&T.

The financing and operations of the various operating companies in the P&T Group were intended to be and were, in part, carried out by means of intercompany loans. On some of the intercompany loans no interest was paid. In November 1937, P&T amended its charter to enable it to make advances or otherwise aid its affiliated corporations. Many of the funds obtained through bank loans by P&T, Inc., were used by the affiliated companies during the years here involved. Collateral for such loans included stock in subsidiaries, notes from subsidiaries, and warehouse receipts owned by the subsidiaries which were received in connection with the notes.

Applications for governmental approval of most of the labels and brand names of domestic whisky which were distributed for sale by Import during the years here involved were made by Distillers.

The liquor industry made no distinction between the companies but considered it was dealing only with Park & Tilford.

During the years 1932 through 1939, inclusive, the official positions held by Schulte, Stewart, Handren, and Bernard in various Park & Tilford companies are set forth below:

|  | Schulte | Stewart | Handren | Bernard |
|---|---|---|---|---|
| P&T, Inc.: |  |  |  |  |
| Chairman of board | 1932–39 |  |  |  |
| President | 1937–39 | 1932–36 |  |  |
| Vice president |  |  | 1937–39 | 1932–39 |
| Treasurer |  |  |  | 1937–39 |
| P&T: |  |  |  |  |
| President |  | 1934–37 |  | 1937–39 |
| Vice president |  |  | 1934–39 | 1934–37 |
| Treasurer |  |  | 1934–39 |  |
| Import: |  |  |  |  |
| President |  | 1933–37 | 1937–39 |  |
| Vice president |  |  | 1934–37 | 1933–39 |
| Treasurer |  |  | 1935–38 | 1938–39 |
| Distillers: |  |  |  |  |
| President |  |  | 1938–39 |  |
| Vice president |  |  |  | 1938–39 |
| Treasurer |  |  |  | 1938–39 |
| Kentucky: |  |  |  |  |
| President |  |  | 1938–39 |  |
| Vice president |  |  |  | 1938–39 |
| Treasurer |  |  |  | 1938–39 |
| Bonnie: |  |  |  |  |
| President |  |  | 1938–39 |  |
| Vice president |  |  |  | 1938–39 |
| Treasurer |  |  |  | 1938–39 |

Prior to 1938, C. J. Coad (hereinafter referred to as Coad) was listed as the president of Distillers. At the time it was initially decided that Coad was to become president of Distillers, Stewart was

an active officer in P&T. It was believed to be undesirable for Stewart's name to be associated with a company having the word "Distillers" in its title because of Import's foreign contacts.

Stewart went to work for P&T in December 1921. At that time, he was 36 years old. He had previously been employed by the Lawney Candy Co.

Handren began working for P&T in January 1922, at the age of 18. At that time, Stewart was vice president and general manager of the candy division of P&T.

Schulte acquired control of P&T in 1923. Schulte was considerably older than either Handren or Stewart. He was generally regarded as a man of considerable wealth. His wealth was due, at least in part, to his important interests in various other ventures which included Yellow Taxi Corp. and the Schulte Cigar Store chain.

While Handren was still quite young at the time Schulte took over control of P&T, Handren was nonetheless assigned to several additional corporate offices within the next few years thereafter. Some of the new offices which Schulte was responsible for giving to Handren during this period involved considerable executive responsibility.

Schulte made the major policy decisions regarding the whisky business of the P&T companies. Prior to Stewart's death, Schulte gave a great deal of weight to his opinion; however, the ultimate decisions were made by Schulte. Suggestions concerning the whisky business by Handren and Bernard were generally discussed with Stewart first, who would in turn discuss them with Schulte.

The Old Overholt distillery was acquired in 1926 and the Large distillery in 1930. P&T owned 25 percent of the stock of these distilleries, while Schulte, through his control of D. A. Schulte, Inc., controlled an additional 64 percent. In 1933, both distilleries and their stocks of whisky were sold. Stewart was in favor of the sale. Handren and Bernard were opposed to the sale of the Large distillery; however, Handren felt that the sale of the Old Overholt distillery was wise because of the large profit inuring to Schulte and P&T. The views of Stewart, Handren, or Bernard had no bearing on the sale of the distilleries since it was ostensibly based on financial considerations. Handren and Bernard had no opportunity to express an opinion on the wisdom of the foregoing sale until after the initial sales contract had already been entered into.

Stewart was opposed to any company bearing the Park & Tilford name engaging in the domestic production of whisky. He wished to confine the whisky business to handling imports because he considered importing to be a more gentlemanly type of business. It was also Stewart's contention that the brand names were already

created and all you had to do was aline yourself with them, the foreign principals paid for the advertising and promotion, and there were no production problems. His opposition to domestic production also stemmed from his fear of alienating the foreign principals from whom the imports were obtained. He believed that those foreigners would resent any interest in the domestic business because sales efforts would be diverted from their own products and in that way the domestic business would be built up at their expense. At the time of his death, there were indications that Stewart's views as to the domestic whisky business might be changing.

Stewart also considered that the introduction of a spirit blend would hurt the prestige of the Park & Tilford name and, therefore, opposed the introduction of P&T Reserve, a spirit blend. Handren and Bernard persuaded Stewart and Schulte to allow Import to sell a few straight whiskies and blends of straight whiskies in 1934, but spirit blends were absolutely forbidden.

Prior to 1935, the Park & Tilford name had been associated with and known as a purveyor of quality candy and certain fine imported items such as cigars, cosmetics, and perfume. Prior to repeal, the name was not associated with liquor.

Stewart wanted the Park & Tilford companies to be primarily importers. Handren wanted one of the P&T companies to be a distiller as well as a bottler. Handren's attitude stemmed from experience with other foreign products that had been developed at the expense of the importer and then taken over by the foreign producer.

Handren believed that Stewart had done a good job in getting certain foreign imports. He did not object to the imports so long as they were not to the exclusion of the Park & Tilford Group's own operations. He believed that importing should be a part of its operations but contended the name Park & Tilford should be established in its own right as something that could not be taken away.

At the time Schulte and his associates first acquired control of Old Overholt & Co., the latter's plant located at Broad Ford, Pa., was still in very good condition despite the fact that there had been no production in it since 1917. It was decided that this plant should be reactivated to distill whisky for medicinal use. Handren was put in general charge of the project and pursuant thereto was made the president of Old Overholt & Co. in December 1929. By February 1930, Handren had employed all the necessary staff of employees. Many of these employees were experienced men who had worked at the same plant prior to prohibition. This staff had produced some 30,000 barrels of whisky under Handren's general supervision by the time the Overholt assets, along with the Large assets, were sold to National Distillers in the summer of 1933.

The Large distillery was never operated at any time during the period of its control by Schulte and his associates. However, National Distillers' plans called for its prompt reactivation and Handren helped get such plans underway while National Distillers was in the process of taking over the plant.

Handren believed that a distillery should be purchased in conjunction with the original launching of the Import venture primarily because such a move would assure the regular and continuing availability, at a reasonable price, of whisky which was of a consistent and uniform quality.

Bernard also favored the early acquisition of a distillery. He discussed this subject with Schulte very shortly after first learning that National Distillers was unwilling to forgo the acquisition of the Large distillery and made a determined effort to persuade him that it would be possible to make tremendous profits from the operation of a distillery during the first few years after repeal because of the current scarcity of whisky at that time. Bernard also believed that the ownership and operation of a distillery would continue to yield a reasonably good profit thereafter.

By reason of the activities described above, Handren had acquired considerable technological knowledge with regard to whisky prior to the time when repeal became effective on December 5, 1933. While a limited number of older whisky experts with outstanding reputations and very extensive prior experience were active in the industry after repeal, Handren was much more familiar with distillation processes and other aspects of the business than most of the other individuals who went into the whisky business at that time. Neither Schulte nor Stewart had ever taken an active part in the operation of the Old Overholt distillery and Bernard was totally unfamiliar with any phase of the liquor business at the time of repeal. Handren was accordingly given considerable executive responsibility in the domestic whisky field although his activities were extensively supervised.

Handren was kept away from the foreign principals by Stewart.

After Stewart's death on January 31, 1937, Schulte continued to play a dominant role in the determination of the basic business policies of the Park & Tilford companies. Although Schulte consulted Handren and Bernard on various policy matters, he made the final decisions. While Handren and Bernard generally exercised the day-to-day authority that went with the various corporate offices to which they were appointed from time to time, they still had to get Schulte's approval on important matters.

Handren was primarily concerned with the whisky business. He dealt with the foreign suppliers, handled the purchase of distilleries

and bulk whiskies, approved formulas, and established product lines. Bernard was primarily concerned with the financial aspect of the business.

Schulte was regularly supplied with copies of the complete monthly statements which Bernard caused to be made up in regard to the operations of the various Park & Tilford companies. While Schulte did not ordinarily study such statements in detail, he always concerned himself with the overall profit showing and as to whether any item of expenditure had been permitted to increase by more than he had previously approved. Advertising was one item that Schulte kept complete control over. It was exceedingly difficult at all times to induce Schulte to agree to the expenditure of a substantial amount of money for the advertisement of any product, and he never liked to see an increase in total advertising expenses show up in the monthly statements.

The search for another distillery began after Handren had been abroad in January 1938 and convinced the foreign principals that such a step would not be detrimental to their interests. Handren had been in London in December 1937, where a series of extended discussions took place, and he had made a previous visit some 5 or 6 months earlier. Prior to this time, no one in the top management of any of the Park & Tilford companies had attempted to convince the foreign principals that a distillery would not be detrimental to them.

At a meeting on June 17, 1938, attended by Schulte, Handren, Bernard, and J. A. Eisner, it was decided that the following proposal be made for the acquisition of the Independent Distillers of Kentucky (hereinafter referred to as Independent Distillers) :

1: The offer to purchase the assets of Independent Distillers of Kentucky is to be made by G. with a down payment of $10,000 and the assets to be conveyed by the Trustee in Bankruptcy, free and clear of all encumbrances and to include the real estate of approximately 20 acres, all buildings thereon, all machinery, equipment and fixtures, personal property and raw materials therein situated, as well as at least $92,000 of choses in action consisting of accrued unpaid storage charges and advances for Kentucky Manufacturing Tax; G. to have the right to withdraw such offer at any time prior to July 31st, 1938.

2: Park & Tilford to agree to purchase such assets from G. for $135,000 payable, $10,000 down together with an assignment from G. of his agreement with the Trustee in Bankruptcy (pursuant to which Park & Tilford will pay to the Trustee $75,000 upon delivery to it all said assets as aforesaid) and at such time will pay the balance of $50,000 to G.

3: If said assets are not delivered to Park & Tilford as aforesaid, the entire deal is to be of no force and effect and Park & Tilford is to have no obligation to G. or anyone else in connection therewith.

Handren visited the Independent Distillers' property which was located in Bardstown, Ky., and attempted to purchase the distillery.

However, a mutually satisfactory arrangement could not be worked out.

On October 7, 1938, Kentucky [5] purchased from Bonnie Bros. (a corporation which bore no relationship to Bonnie) a distillery, warehouses, and real estate located at Louisville, Ky. Kentucky also acquired the storage and warehouse accounts accrued with respect to liquor stored in the warehouses on August 31, 1938. The purchase price of the property purchased was $449,110.22. On September 6, 1940, pursuant to a contract of purchase and sale dated August 30, 1940, between Distillers and a receiver for Hamburger Distillery (an independent corporation), Distillery acquired a distilling plant, bottling plant, warehouse, and other assets, all located at Brownsville, Pa. Distillers acquired the following distilleries after 1940:

Aug. 4, 1941—Krogman Distillery, Tell City, Ind.
Aug. 5, 1941—Woodford County Distillery, Midway, Ky.
Apr. 17, 1942—Owings Mills Distillery, Owings Mills, Md.

Although the foregoing distilleries were obtained at favorable prices, this consideration was a minor reason for their acquisition. The principal reason was to insure continuity of supply of high-quality whisky at distiller's costs. Further, having its own supply of whisky would put the P&T Group in a position to trade for any age whisky needed at distiller's costs and thus reduce its bulk whisky cost to the level enjoyed by its principal competitors.

While Handren had always considered that it would be desirable to own a distillery, he did not begin the active search which culminated in the location and purchase of the Bonnie Bros. plant until after January 1938. Before the active search began, it was necessary that Handren convince the foreign import principals that the expansion in the American whisky field would not result in the neglect of their products.

During the first year or so after repeal, both Schulte and Stewart were of the opinion that Import's use of the Park & Tilford name on a domestic whisky product containing alcohol in the form of neutral spirits might adversely affect the good reputation of the basic name. This opinion was based on their awareness that, prior to repeal, the public generally considered so-called bathtub gin and the various other products which contained alcohol in similar form to be of inferior quality. These views were not shared by Handren and Bernard. In their opinion, the reputation of the Park & Tilford name was so strong that consumers would accept a spirit blend whisky bearing its name as a quality product.

[5] The distillery and other property were actually purchased by Parkway Distillery, Inc. On Oct. 10, 1938, or 3 days after the purchase, the corporate name of Parkway Distillery was formally changed to Park & Tilford Distillers of Kentucky.

The following schedule shows the sales of Park & Tilford Reserve:

PARK & TILFORD RESERVE BLEND

|  | 1935 | 1936 | 1937 |
|---|---|---|---|
| Net sales [1] | $107,193.69 | $337,001.54 | $757,181.39 |
| Cost of sales [2] | $91,174.01 | $333,775.25 | $650,657.98 |
| Gross profit | $16,019.68 | $3,226.29 | $106,523.41 |
| Number of cases sold [3] | 5,719 | 20,600 | 44,440 |
| Selling price per case | $18.74 | $16.36 | $17.04 |
| Cost per case | $15.94 | $16.20 | $14.64 |
| Gross profit per case | $2.80 | $0.16 | $2.40 |

|  | 1938 | 1939 | 1940 |
|---|---|---|---|
| Net sales [1] | $995,997.88 | $1,860,067.28 | $4,165,154.61 |
| Cost of sales [2] | $794,916.90 | $1,405,340.65 | $3,191,889.06 |
| Gross profit | $201,080.98 | $454,726.63 | $973,265.55 |
| Number of cases sold [3] | 61,003 | 107,773 | 208,854 |
| Selling price per case | $16.33 | $17.25 | $19.94 |
| Cost per case | $13.03 | $13.03 | $15.28 |
| Gross profit per case | $3.30 | $4.22 | $4.66 |

|  | 1941 | 1942 |
|---|---|---|
| Net sales [1] | $7,194,131.76 | $13,873,161.21 |
| Cost of sales [2] | $5,605,758.55 | $10,846,880.86 |
| Gross profit | $1,588,373.21 | $3,026,280.35 |
| Number of cases sold [3] | 374,899 | 637,352 |
| Selling price per case | $19.19 | $21.77 |
| Cost per case | $14.95 | $17.02 |
| Gross profit per case | $4.24 | $4.75 |

[1] For the years 1937 through 1942 includes sales made by Import to Missouri at prices Missouri charged to its customers.
[2] Cost of sales uniformly represents Import's actual cost of sales for all years.
[3] For the years 1937 through 1942 includes cases resold by Missouri. Such resales were:

| Year | Cases |
|---|---|
| 1937 | 8 |
| 1938 | 61 |
| 1939 | 28 |
| 1940 | 86 |
| 1941 | 422 |
| 1942 | 3,788 |

## Issue 1

### Import

Import is entitled to compute its excess profits credit under the average earnings method pursuant to section 713.

Import's average base period net income and excess profits credits, computed under section 713, without the benefit of section 722, for each of the excess profits tax taxable years here involved is as follows:

| Year | ABPNI | Excess profits credit |
|---|---|---|
| 1940 | $321,199.76 | $305,139.79 |
| 1941 | 398,334.32 | 378,417.60 |
| 1942 | [1] 428,776.16 | [1] 407,337.36 |
| 1943 | [1] 428,776.16 | [1] 407,337.36 |
| 1944 | [1] 428,776.16 | [1] 407,337.36 |
| 1945 | [1] 428,776.16 | [1] 407,337.36 |

[1] Computed under sec. 713(e).

Import's excess profits net income for each of the excess profits tax taxable years here involved is set forth below:

| | |
|---|---|
| 1940 | $492,925.30 |
| 1941 | 802,069.37 |
| 1942 | 1,523,721.43 |
| 1943 | 3,034,763.20 |
| 1944 | 2,576,637.07 |
| 1945 | 3,610,176.96 |

Article II of Regulations 5, which was prescribed under the provisions of the Federal Alcohol Administration Act,[6] provided certain standards of identity for distilled spirits. The pertinent parts are as follows:

SEC. 20. *Application of Standards.*—The standards of identity for the several classes and types of distilled spirits set forth herein shall be applicable to all regulations and permits issued under the Act. Whenever any term for which a standard of identity has been established herein is used in any such regulation or permit, such term shall have the meaning assigned to it by such standard of identity.

SEC. 21. *The Standards of Identity.*—Standards of identity for the several classes and types of distilled spirits set forth herein shall be as follows:

Class 1. *Neutral Spirits or Alcohol.*—"Neutral spirits" or "alcohol" are distilled spirits distilled from any material at or above 190° proof, whether or not such proof is subsequently reduced.

Class 2. *Whiskey.*— (a) "Whiskey" is an alcoholic distillate from a fermented mash of grain distilled at less than 190° proof in such manner that the distillate possesses the taste, aroma, and characteristics generally attributed to whiskey, and withdrawn from the cistern room of the distillery at not more than 110° and not less than 80° proof, whether or not such proof is further reduced prior to bottling to not less than 80° proof; and also includes mixtures of the foregoing distillates for which no specific standards of identity are prescribed herein. "Rye whiskey", "bourbon whiskey", "wheat whiskey", "corn whiskey", "malt whiskey", or "rye malt whiskey" is whiskey which has been distilled at not exceeding 160° proof from a fermented mash of not less than 51% rye grain, corn grain, wheat grain, malted barley grain, or malted rye grain, respectively, and also includes mixtures of such whiskeys where the mixture consists exclusively of whiskeys of the same type.

(b) "Straight whiskey" is an alcoholic distillate from a fermented mash of grain distilled at not exceeding 160° proof and withdrawn from the cistern room of the distillery at not more than 110° and not less than 80° proof, whether or not such proof is further reduced prior to bottling to not less than 80° proof, and is—

(1) Aged for not less than twelve calendar months if bottled on or after July 1, 1936, and before July 1, 1937; or

(2) Aged for not less than eighteen calendar months if bottled on or after July 1, 1937, and before July 1, 1938; or

(3) Aged for not less than twenty-four calendar months if bottled on or after July 1, 1938.

---

[6] Pub. L. 401, 74th Cong., 1st Sess. (Aug. 29, 1935).

The term "straight whiskey" also includes mixtures of straight whiskey, which, by reason of being homogeneous, are not subject to the rectification tax under the Internal Revenue Laws.

(c) "Straight rye whiskey" is straight whiskey distilled from a fermented mash of grain of which not less than 51% is rye grain.

(d) "Straight bourbon whiskey" and "straight corn whiskey" are straight whiskey distilled from a fermented mash of grain of which not less than 51% is corn grain.

(e) "Straight wheat whiskey" is straight whiskey distilled from a fermented mash of grain of which not less than 51% is wheat grain.

(f) "Straight malt whiskey" and "straight rye malt whiskey" are straight whiskey distilled from a fermented mash of grain of which not less than 51% of the grain is malted barley or malted rye, respectively.

(g) "Blended whiskey" (whiskey—a blend) is a mixture which contains at least 20% by volume of 100 proof straight whiskey and, separately or in combination, whiskey or neutral spirits, if such mixture at the time of bottling is not less than 80° proof.

(h) "Blended rye whiskey" (rye whiskey—a blend), "Blended bourbon whiskey" (bourbon whiskey—a blend), "Blended corn whiskey" (corn whiskey—a blend), "Blended wheat whiskey" (wheat whiskey—a blend), "Blended malt whiskey" (malt whiskey—a blend) or "Blended rye malt whiskey" (rye malt whiskey—a blend) is a blended whiskey which contains not less than 51% by volume of straight rye whiskey, straight bourbon whiskey, straight corn whiskey, straight wheat whiskey, straight malt whiskey, or straight rye malt whiskey, respectively.

(i) "A blend of straight whiskeys" (blended straight whiskeys), "A blend of straight rye whiskeys" (blended straight rye whiskeys), "A blend of straight bourbon whiskeys" (blended straight bourbon whiskeys), "A blend of straight corn whiskeys" (blended straight corn whiskeys), "A blend of straight wheat whiskeys" (blended straight wheat whiskeys), "A blend of straight malt whiskeys" (blended straight malt whiskeys), and "A blend of straight rye malt whiskeys" (blended straight rye malt whiskeys) are mixtures of only straight whiskeys, straight rye whiskeys, straight bourbon whiskeys, straight corn whiskeys, straight wheat whiskeys, straight malt whiskeys, or straight rye malt whiskeys, respectively.

(j) "Spirit whiskey" is a mixture (1) of neutral spirits and not less than 5% by volume of whiskey, or (2) of neutral spirits and less than 20% by volume of straight whiskey, but not less than 5% by volume of straight whiskey, or of straight whiskey and whiskey, if the resulting product at the time of bottling be not less than 80° proof.

(k) "Scotch whiskey" is a distinctive product of Scotland, manufactured in Scotland in compliance with the laws of Great Britain regulating the manufacture of Scotch whiskey for consumption in Great Britain, and containing no distilled spirits less than three years old: *Provided*, That if in fact such product as so manufactured is a mixture of distilled spirits, such mixture is "Blended Scotch whiskey" (Scotch whiskey—a blend). "Scotch whiskey" shall not be designated as "straight."

(1) "Irish whiskey" is a distinctive product of Ireland, manufactured either

in the Irish Free State or in Northern Ireland, in compliance with the laws of those respective territories regulating the manufacture of Irish whiskey for consumption in such territories, and containing no distilled spirits less than three years old : *Provided,* That if in fact such product as so manufactured is a mixture of distilled spirits, such whiskey is "Blended Irish whiskey" (Irish whiskey—a blend). "Irish whiskey" shall not be designated as "straight."

(m) "Canadian whiskey" is a distinctive product of Canada, manufactured in Canada in compliance with the laws of the Dominion of Canada regulating the manufacture of whiskey for consumption in Canada, and containing no distilled spirits less than two years old : *Provided,* That if in fact such product as so manufactured is a mixture of distilled spirits, such whiskey is "Blended Canadian whiskey" (Canadian whiskey—a blend). "Canadian whiskey" shall not be designated as "straight."

(n) "Blended Scotch type whiskey" (Scotch type whiskey—a blend) is a mixture made outside Great Britain and composed of—

(1) Not less than 20% by volume of 100 proof malt whiskey or whiskeys distilled in pot stills at not more than 160° proof, from a fermented mash of malted barley dried over peat fire, whether or not such proof is subsequently reduced prior to bottling to not less than 80° proof, and

(2) Not more than 80% by volume of whisky distilled at more than 180° proof and less than 190° proof, whether or not such proof is subsequently reduced prior to bottling to not less than 80° proof.

In lieu of including the word "Type", the designation may include the word "American" at the beginning thereof if produced in the United States; or corresponding wording if produced in any other country outside Great Britain.

(o) "Blended Irish type whiskey" (Irish type whiskey—a blend) is a product made outside Great Britain or the Irish Free State and composed of—

(1) A mixture of distilled spirits distilled in pot stills at not more than 171° proof, from a fermented mash of small cereal grains, of which not less than 50% is dried malted barley, and unmalted barley, wheat, oats, or rye grains, whether or not such proof is subsequently reduced prior to bottling to not less than 80° proof ; or

(2) A mixture consisting of not less than 20% by volume of 100 proof malt whiskey or whiskeys distilled in pot stills at approximately 171° proof, from a fermented mash of dried malted barley, whether or not such proof is subsequently reduced prior to bottling to not less than 80° proof ; and

(3) Not more than 80% by volume of whiskey distilled at more than 180° proof and less than 190° proof, whether or not such proof is subsequently reduced prior to bottling to not less than 80° proof.

In lieu of including the word "Type", the designation may include the word "American" at the beginning thereof if produced in the United States, or corresponding wording if produced in any other country outside Great Britain or the Irish Free State.

Class 3. *Gins* * * *

Class 4. *Brandies* * * *

Class 5. *Rum* * * *

Class 6. *Cordials and Liqueurs* * * *

Class 7. *Imitations* * * *

Class 8. *Geographical Designations* * * *

Class 9. *Products Without Geographical Designations but Distinctive of a Particular Place* * * *

Straight whiskies or blends of straight whiskies contain no neutral spirits. Neutral spirits, in a spirit blend, only dilute the qualities in a whisky without, in any way, improving them.

Neutral spirits are distilled at over 190 proof, contain only ethyl alcohol and water, and are in many instances essentially odorless and tasteless. They are normally used in the manufacture of spirit blends immediately after distillation, but when not, are stored or shipped in metal containers which do not affect their chemistry, taste, or odor.

Whisky is normally distilled at 120 to 130 proof. At this proof the distillate contains not only ethyl alcohol but a variety of other alcohols and other chemical substances deriving from the grains used in the distillation process. These chemical substances, other than ethyl alcohol, give the distillate a distinctive odor and taste. The whisky is normally stored in new charred white oak barrels. The alcohols leach various chemicals from the wood. All these chemicals, both those obtained in distillation and those leached out of the wood, are known as solids or as congenerics. These give the whisky its distinctive qualities of color, taste, and odor. The foregoing whisky production practices, including the range of distillation proofs, relate to the domestic whisky production practices which most of the prominent whisky producers endorsing the Kentucky tradition have generally associated with a finished product of the very best possible quality. These practices have not been universally followed in this country. The production practices which have been traditionally followed in Great Britain and Canada are entirely different.

Spirit blends, because of the relatively large percentage of neutral spirits and small percentage of whisky, contain a much smaller quantity of congenerics than does straight whisky. Therefore, spirit blends are light in taste and odor while straight whisky or blends of straight whisky are heavy.

Neutral spirit blends have lower production costs than either straight whisky or a blend of straight whisky, since the grain neutral spirit content of a blend is not aged in expensive new charred white oak barrels and consequently does not suffer loss by evaporation from the date of distillation to the date of bottling as is the case with respect to aged whisky bottled either as straight whisky or a blend of straight whisky.

The liquor industry regards spirit blends as a different and separate class of whisky. There has long been controversy within the industry over the relative qualities and superiority of spirit blends as

compared to straight whiskies and blends of straight whisky. Protagonists of straight whiskies have referred contemptuously to spirit blends as "cut whisky" and "imitation whisky." Many distillers have never produced a spirit blend. On the other hand, the largest distiller in the United States until recently would produce nothing but spirit blends.

The market for spirit blends is and for many years has been different from the market for straight whisky and blends of straight whiskies. Prior to prohibition two-thirds of the whisky consumption in the United States was accounted for by spirit blends. California, Texas, and Kentucky were areas consuming principally straight whiskies or blends of straight whiskies. Between 1936 and 1939 the percentage of domestic whisky consumption nationally accounted for by spirit blends increased from about 25 to about 33 percent. Following the base period years, the percent of the market occupied by spirit blends continued to increase. The growth in the spirit blend market was not affected in any way by the increase in the age and supply of whisky distilled after repeal.

The first labels used for P&T Reserve were printed on February 25, 1935, and Import was receiving a supply of this brand from Distillers prior to the end of that same month. Import's first sales thereof took place in March 1935.

No neutral spirit blends were sold by Import prior to December 12, 1934, when the first labels were printed for a product of this type. This product carried the brand name "Schulte De Luxe" and was what was commonly known in the industry as a private-label brand. The front labels used for such a brand do not carry any legend with respect to the name of the producer or bottler thereof but the back labels do in all instances carry such a legend.

The first brand of whisky containing neutral spirits and making use of a front label which carried the name "Park & Tilford" or "P&T" was P&T Reserve.

Distillers' total billings to Import with respect to the brand Schulte De Luxe amounted to $32,636.99 for the month of December 1934. This was a fairly substantial amount in the light of contemporaneous billings with respect to Kentucky Bred of $38,472.73 and $65,918.68 in November and December of the same year. After commencing the production of P&T Reserve in February of 1935, Distillers began producing certain other spirit blends under private labels which carried the word "Schulte" as a part of their brand names. Its total billings for all the private label brands using the name "Schulte" amounted to $47,149.92 in the year 1935. The total billings with respect to P&T Reserve in the same year amounted to $122,731.34. The corresponding amounts billed in 1935 with respect to other spirit blends included

$43,666.28 for P&T 1840 (first label printing, March 19, 1935) and $10,345.95 for P&T Special Bar Whisky (first label printing, October 10, 1935).

A private-label brand always bears the name of the retailer who sells the brand. It is not advertised or promoted by the bottler and generally carries a relatively low gross profit. Private-label sales were never of any great importance for any of the larger companies in the industry.

Since there would normally be only one customer for each of the private-label brands, their lives, except for Schulte De Luxe, tended to be relatively short. Such private-label brands never accounted for more than approximately 2.5 percent of Imports' domestic whisky sales at any time during the base period. None of these private labels were sold under the Park & Tilford name.

The ingredients used in making up the first product to be sold under the brand name "P&T Reserve" included certain Canadian whisky. Some 15,000 cases of this whisky had been purchased prior to repeal. Primarily because this whisky was contained in pint bottles that had not been properly filled, its disposition had been delayed for an extended period because of the unsuccessful efforts to obtain the import permits necessary for its sale in this country without rebottling. Some 7,000 cases of the original lot were finally sold to a Canadian buyer but there seemed to be no market for the balance of about 8,000 cases. Under these circumstances, Handren was able to persuade Schulte that this balance should be combined with 75 percent neutral spirits and sold as P&T Reserve.

Because of the necessity of using the Canadian whisky, Schulte agreed to the introduction of P&T Reserve, although he still believed that the distribution of a whisky with neutral spirits in it might reflect on Park & Tilford's reputation. Canadian whisky was used in P&T Reserve through at least part of 1937.

Because of preprohibition trends, Handren and Bernard were convinced that the spirit blend market would be a tremendous one after repeal. Although spirit blend consumption was a relatively small percentage of the total national consumption of whisky immediately after repeal, they expected it to grow and P&T Reserve to grow with it. This expectation was borne out by subsequent events.

Sales of domestic whisky products containing neutral spirits began to account for a fairly large portion of the total sales of all kinds of domestic whisky products in the eastern section of the United States within the first 2 or 3 years immediately after repeal and probably accounted for about 75 or 80 percent of such total sales by the end of the base period. On a national basis, the percentage of the total sales of all domestic whiskies accounted for by such neutral spirit blends also

increased on an annual basis in every year from 1934 up through at least 1939. These markets were not available to Import prior to the introduction of P&T Reserve. Thus, the introduction of P&T Reserve opened up new markets which were not hitherto available to Import.

Furthermore, although the East was the main market for neutral spirit blends and the West traditionally a "straight" market, blends could have been sold in the West in volume had the effort been made.

Import's management regarded P&T Reserve as a different class of whisky.

Throughout the years here involved, the major spirit blends fell into three general price brackets, which were as follows:

*Class A—High Price—Over $1.25 a Pint*
  Seagram 7 Crown
  Calvert Reserve
  Three Feathers Silver Label
  G & W Seven Star
  Schenley Black Label
*Class B—Middle Price—$1–$1.25 a Pint*
  Seagram 5 Crown
  Calvert Special
  G & W Two Star
  G & W Five Star
  Three Feathers
  Wilson
  Schenley Red Label
  National Eagle
  P&T Reserve
*Class C—Low Price—Less Than $1.00 a Pint*
  Brigadier
  Cobb's Creek Reserve (National)
  Green River (Schenley)
  Wilkins Family (Schenley)
  Kessler (Seagram)

The middle price bracket accounted for the largest volume of sales, the high price bracket was second, and the cheapest was third.

Immediately after repeal there were no established domestic brands of whisky and the American consumer had no allegiance to any brands of domestic whisky. His preferences were governed principally by price. Had P&T Reserve been introduced and promoted at that time, P&T Reserve would have had increased sales because of the reputation for quality merchandise associated with the name of Park & Tilford.

P&T Reserve was not intended to replace any other brand distributed by Import but to constitute a separate and distinct addition to its product line.

There was no displacement in Import's sales of one type of domestic whisky by another during the base period. Import's sales of

all types of domestic whisky during the base period years were at least as favorable as those of the industry as a whole, and Import's sales of neutral spirit blends grew at a substantially greater rate than those of spirit blends of the industry as a whole. Comparisons with industry statistics are set forth below:

*Output of all types of whiskies and domestic gins—Import Corp. and U.S. industry, 1936–39*

TYPE OF WHISKY

| | Import Corp. (proof gallons) | | | | U.S. industry (millions of proof gallons) | | | |
|---|---|---|---|---|---|---|---|---|
| | 1936 | 1937 | 1938 | 1939 | 1936 | 1937 | 1938 | 1939 |
| Straight whisky, unrectified: | | | | | | | | |
| Bottled in bond | | | 9,852 | 13,290 | 1.5 | 2.7 | 5.0 | 9.8 |
| Less than 100° | 169,638 | 184,724 | 144,966 | 169,248 | 55.3 | 53.4 | 51.3 | 50.7 |
| Total unrectified | 169,638 | 184,724 | 154,818 | 182,538 | 56.8 | 56.1 | 56.3 | 60.5 |
| Rectified blends of straights | 158,409 | 220,292 | 157,579 | 155,047 | 9.0 | 6.2 | 4.0 | 3.6 |
| Total straight whisky | 328,047 | 405,016 | 312,397 | 337,585 | 65.8 | 62.3 | 60.3 | 64.1 |
| Spirit blends | 65,214 | 128,966 | 167,099 | 292,450 | 19.7 | 27.1 | 27.8 | 32.0 |
| Total whisky | 393,261 | 533,982 | 479,496 | 630,035 | 85.5 | 89.4 | 88.1 | 96.1 |
| Gin | 189,850 | 217,044 | 171,494 | 137,488 | 14.3 | 14.7 | 13.2 | 13.2 |

INDEXES 1936=100

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Straight whisky, unrectified: | | | | | | | | |
| Bottled in bond | | | | | 100.0 | 180.0 | 333.3 | 653.3 |
| Less than 100° | 100.0 | 108.9 | 85.5 | 99.8 | 100.0 | 96.6 | 92.8 | 91.7 |
| Total unrectified | 100.0 | 108.9 | 91.3 | 107.6 | 100.0 | 98.7 | 99.2 | 106.2 |
| Rectified blends of straights | 100.0 | 139.1 | 99.5 | 97.9 | 100.0 | 68.9 | 44.4 | 40.0 |
| Total straight whisky | 100.0 | 123.5 | 95.2 | 102.9 | 100.0 | 94.7 | 91.6 | 97.4 |
| Spirit blends | 100.0 | 197.8 | 256.2 | 448.4 | 100.0 | 137.5 | 141.1 | 162.4 |
| Total whisky | 100.0 | 135.8 | 121.9 | 160.2 | 100.0 | 104.6 | 103.0 | 112.4 |
| Gin | 100.0 | 114.3 | 90.3 | 72.4 | 100.0 | 102.8 | 92.3 | 92.3 |

Rectification is the process by which distilled spirits are blended together, or otherwise processed by the addition of spirits or flavoring or coloring material.

During the years 1936 to 1939, it was not easy to establish a new brand in the liquor market.

There was no money spent for advertising P&T Reserve in 1935. In 1936, except for one multiple advertisement in a New York magazine, a small amount of advertising for that year was carried in Pennsylvania, where it was mandatory in order to have the brand sold in that State.

The direct advertising expense of P&T Reserve for the years 1936–39 is set forth below:

1936 _____ $7,480.70
1937 _____ 17,313.98
1938 _____ 40,739.53
1939 _____ 94,200.37

The following schedule indicates the total amount of all Import's advertising expenditures from year to year and the percentage relationships which obtained from year to year between the current direct advertising expense for P&T Reserve and the total of all advertising expenses incurred in the same year and the respective percentages of increase shown in the case of P&T Reserve from year to year after 1936:

| Year | Total advertising expenditures | Percentage ratio of "direct" advertising for P&T Reserve to total of all advertising expenditures | Percentage of increase over prior year |
|---|---|---|---|
| 1934 | $154, 657. 57 | | |
| 1935 | 237, 026. 32 | | |
| 1936 | 244, 174. 73 | 3. 06 | |
| 1937 | 267, 094. 97 | 6. 48 | 131 |
| 1938 | 180, 063. 23 | 22. 63 | 135 |
| 1939 | 227, 628. 70 | 41. 38 | 131 |

Bernard and Handren were allowed greater latitude in running the business after Stewart's death, but Schulte insisted on reviewing all advertising expenditures. None could be made without his approval. Schulte was extremely reluctant to spend money on advertising, and particularly restricted advertising of P&T Reserve. However, as P&T Reserve became more and more successful during the base period years, Schulte's attitude in this regard became increasingly more liberal.

Although there was allowed an advertising budget of $2 per case for Private Stock and $1 per case for Kentucky Bred throughout the base period, no budget was ever allowed for P&T Reserve.

Advertising alone is not the sole criterion or cause of increased sales in the whisky industry although it is an important factor. Because of the important effect of advertising during the period 1934–35 before the consuming public acquired an allegiance to brand names, had P&T Reserve been promoted vigorously through selling and/or advertising in the period immediately after repeal, even at the cost of reducing advertising later in the base period, P&T Reserve would have had increased sales.

Because of the increased efforts to sell P&T Reserve after Stewart's death, by the end of 1937, P&T Reserve had become one of Import's three principal brands.

Despite the fact that P&T Reserve started later than all of the major brands in the spirit blend market, its reception and growth

were very good. The sales of P&T Reserve in cases is set forth below with the percentage of increase in each year's sales over the sales in the prior year:

| Year | Case sales | Percent of increase |
|---|---|---|
| 1935 | 5,719 | |
| 1936 | 20,600 | 260 |
| 1937 | 44,439 | 116 |
| 1938 | 61,005 | 37 |
| 1939 | 107,773 | 77 |

The increase in growth and importance of the sales and profits of P&T Reserve in relation to Import's other products is illustrative of the change in the character of Import's business during the base period. P&T Reserve became the bulwark of Import's position in the liquor business.

The dollar sales and gross profits of P&T Reserve were growing rapidly and had not reached a normal level by the end of the base period.

The growth of P&T Reserve in the portion captured of the national market for spirit blends is set forth in the two tables below:

| Year | P&T Reserve as percent of U.S. blend market | Increase of percent of market over preceding year | P&T Reserve as percent of U.S. blend market | Increase of percent of market over preceding year |
|---|---|---|---|---|
| | *Wine gallons* | | *Proof gal. of spirits content in spirit blends* | |
| 1936 | 0.276 | | 0.331 | |
| 1937 | .438 | 58.7 | .466 | 40.8 |
| 1938 | .585 | 33.6 | .609 | 30.7 |
| 1939 | .895 | 53.0 | .964 | 58.3 |
| 1940 | 1.568 | 75.2 | 1.583 | 64.2 |
| 1941 | 2.920 | 86.2 | 2.279 | 44.0 |

The growth and importance of P&T Reserve to Import is shown below:

| Year | Total net sales | Net sales of P&T Reserve | Ratio of P&T Reserve sales to total sales |
|---|---|---|---|
| | | | *Percent* |
| 1936 | $8,568,420 | $337,002 | 3.9 |
| 1937 | 10,064,675 | 757,181 | 7.5 |
| 1938 | 7,482,228 | 995,998 | 13.3 |
| 1939 | 8,753,322 | 1,860,067 | 21.2 |
| 1940 | 10,691,956 | 4,165,155 | 39.0 |
| 1941 | 14,969,850 | 7,194,132 | 48.1 |
| 1942 | 24,366,878 | 13,873,161 | 56.9 |

| Year | Total gross profit | Gross profit on P&T Reserve | Ratio of P&T Reserve to total gross profit |
|------|-----|-----|-----|
| | | | Percent |
| 1936 | $1,539,263 | $3,226 | 0.2 |
| 1937 | 2,001,063 | 106,523 | 5.3 |
| 1938 | 1,409,569 | 201,081 | 14.3 |
| 1939 | 1,696,360 | 454,727 | 26.8 |
| 1940 | 2,243,072 | 973,266 | 43.4 |
| 1941 | 3,008,838 | 1,588,373 | 52.8 |
| 1942 | 4,583,101 | 3,026,280 | 66.0 |

Each succeeding year after repeal it became harder to achieve a competitive position.

If Import had introduced P&T Reserve at the time the rest of the industry introduced neutral blends, i.e., earlier, its sales would have been greater by the end of the base period.

If P&T Reserve had been introduced 2 years earlier than it was, its rate of growth would have been greater than it actually was.

Had the advertising money expended in the first years of its introduction been spent in 1934, it would have produced a much greater benefit.

The four major concerns, commonly referred to as Schenley, National Distillers, Hiram Walker, and Seagram, which occupied a dominant position in the U.S. liquor industry throughout the base period, enhanced their overall share of the total market during such period, but this increase in the physical volume of their combined sales did not result in any increase in their combined net profits. There was no common industry pattern of sales or profits during the base period and the total number of different firms which were actively engaged in the rectification and distribution of domestic whisky products was decreasing throughout such period.

At all times during the years 1933 through 1939, Import had adequate resources at its command to finance the promotion and sale of P&T Reserve and to acquire the whisky necessary for the constructive sales of P&T Reserve.

Import would have had adequate supplies of bulk whisky at all times from 1933 on to meet the requirements of the constructive sales of P&T Reserve had it been introduced immediately after repeal.

There was a change in the character of Import's business during the base period because of a difference in products furnished; that is, the introduction of P&T Reserve.

Import's average base period net income does not reflect the normal operations for the entire base period of its business, and its business did not reach, by the end of the base period, the earnings level which

it would have reached had it made the change in the character of its business 2 years before it did so. Import qualifies for relief under sections 722(a) and 722(b)(4). Its excess profits taxes were excessive and discriminatory because its average base period net income was an inadequate standard of normal earnings.

Import's normal earnings to be used as a constructive average base period net income for the purpose of computing its excess profits credit are $335,000 for the taxable year ended December 31, 1940, and $586,000 for the taxable years ended December 31, 1941, through December 31, 1945.

## Vat 69

During the years here involved, Import was sole distributor in the United States of Vat 69, a Scotch whisky, under an agreement with William Sanderson & Sons (hereinafter referred to as Sanderson). Prior to 1937, Sanderson was an independent. In or about July 1937 control of Sanderson was acquired by Distillers Corporation, Ltd. (hereinafter referred to as DCL).

At the end of 1939 DCL had ownership of 80 to 85 percent of all Scotch whisky stored in Scotland. DCL had achieved this status by absorption of all the principal Scotch distilleries and brands over the years.

Prior to DCL's acquisition of control of Sanderson, Import's contractual relationship with Sanderson was on a year-to-year basis. On March 10, 1939, Import entered into an agreement with Sanderson to be sole distributor of Vat 69 in the United States, the District of Columbia, and Alaska. Although the contract was executed in March of 1939, it was to be effective as of January 17, 1938, because of a verbal understanding worked out on that date. The contract was to have a duration of 10 years from January 17, 1938. This contract was subject to immediate revocation at DCL's option whenever the total sales for any anniversary year were below 100,000 cases. This contract also involved a continuance of Import's exclusive distributorship for a Scotch known as Rare Old Liqueur Scotch Whiskey.

In July 1937 and in January 1938, Handren visited London and met with Peter Dewar, chairman of DCL. In the 1938 visit, Handren was successful in persuading DCL to make Vat 69 one of their standard brands. DCL's other standard brands were White Horse, Black & White, Dewars White Label, Johnny Walker, and Haig and Haig.

Import's monthly sales of Vat 69 for the years 1935 through 1939 in cases are set forth below:

| | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|
| January | 2,512 | 12,568 | 14,527 | 7,512 | 3,680 |
| February | 6,663 | 8,981 | 9,231 | 3,046 | 3,994 |
| March | 7,087 | 12,761 | 12,036 | 7,871 | 4,030 |
| April | 5,240 | 12,941 | 10,100 | 2,872 | 5,230 |
| May | 9,154 | 10,108 | 12,737 | 4,319 | 4,809 |
| June | 5,929 | 8,682 | 16,744 | 4,529 | 5,253 |
| July | 5,479 | 9,392 | 12,700 | 1,688 | 3,702 |
| August | 5,535 | 10,433 | 11,573 | 3,231 | 4,325 |
| September | 7,567 | 14,924 | 12,286 | 4,539 | 11,795 |
| October | 11,869 | 17,775 | 9,042 | 7,834 | 16,767 |
| November | 12,427 | 19,441 | 15,337 | 10,356 | 9,545 |
| December | 9,404 | 19,672 | 14,680 | 7,023 | 5,812 |
| Total | 88,866 | 157,678 | 150,993 | 64,820 | 78,942 |

On August 11, 1936, the following telegram was sent to Harold Wittaker, export sales manager of William Sanderson & Son, London, England:

Total sales Scotch in America exceeding all expectations and more Americans drinking Scotch than ever before Stop In about two years when American whiskies matured enable Distillers sell four years bottled in bond at cheap prices many people will have developed a taste for Scotch and will continue Scotch drinkers Stop Our Vat sales constantly increasing and outlook more promising every day with opening of new markets Stop All our lines showing marked improvement enabling us increase our sales force Stop This fall offers great opportunity by advertising to consolidate our position and capitalize on present Vat demands Stop Our increased advertising will make it difficult for our competitors to damage or disparage the Vat position Stop With following increased advertising every prospect selling 140,000 cases this year and this consumer demand will make age factor less important Stop We all unanimously recommend following Stop After taking into consideration 28607 dollars already authorized for September new budget suggestions for September October November December calls for further 150,000 dollars making total for year 396,793 dollars Stop Sales 140,000 cases would create budget 350,000 keeping advertising expenditures in line with sales the special 50,000 dollars making up the difference Stop Evenson leaving Wednesday for extended trip including California therefore would appreciate your views by cable as with additional monies can promise distributors in new territories advertising Stop Mailing new budget this week.

The whisky in Vat 69 was declared to be 8 years old on all labels approved through August 13, 1936. On the label approved August 20, 1936, no age appears. During this period, Import made efforts to have the age label restored. On February 10, 1938, authorization was received by Import from the Treasury Department to affix strip labels reading "100% Scotch Whiskies 8 Years Old." On the label approved March 21, 1938, the age first reappears on the brand label. The age appears on all brand labels thereafter.

There is no requirement in Regulations 5 that age appear on the label, but any statement which did appear had to be truthful and accurate. The removal of age from the Vat 69 labels was not caused in any degree by the actions of the Federal Alcohol Administration.

Practically all Scotch whisky is a blend. About 25 percent is a heavy whisky made from barley malt, which gives the distinctive aroma to the product. There is no requirement that this fact be stated on the label.

As one of the standard brands of DCL, Vat 69 was entitled to the finest of DCL's whisky and an advertising allowance of £35,000 per year. All of DCL's standard brands had the same advertising allowance. These were the best known brands of Scotch in the United States during the postrepeal days and throughout the base period years. However, the advertising allowance made by DCL or any other foreign supplier did not fix the upper limit on advertising expenditures.

Import was also the sole distributor of Sanderson's Special Reserve. Special Reserve was a secondary brand of Sanderson's. The better whiskies were used in Vat 69. Special Reserve was in a lower price field than Vat 69, and it received no advertising allowance.

The labels used on Special Reserve initially carried a reference to an age of 7 years. Such reference was eliminated at substantially the same time that the reference to an 8-year age was removed from the Vat 69 labels in August of 1936 with the sole exception that special arrangements were made to have all shipments thereof to the Pennsylvania Liquor Control Board continue to carry a 7-year legend for several months thereafter. These special arrangements were made because a DCL brand known as Lowries Scotch Whiskey, which carried an 8-year legend and had been introduced only a short time prior thereto, was being retailed in the Pennsylvania State liquor stores at 5 cents per bottle less than Special Reserve. The certificates being used in connection with the importation of Special Reserve were changed from 7-year to 4-year certificates in December 1936 subject to the above-mentioned exception in the case of shipments to the Pennsylvania Liquor Control Board.

The sales by Import, in cases, of Sanderson's Special Reserve for the years 1935 through 1939, inclusive, were as follows:

| Year | Cases sold |
|------|------------|
| 1935 | 6, 820 |
| 1936 | 28, 041 |
| 1937 | 46, 043 |
| 1938 | 31, 160 |
| 1939 | 42, 208 |

Set forth below is a table showing imports of distilled whisky from the United Kingdom during the years 1934 through 1939. This

data refers primarily to Scotch whisky and represents practically all of the Scotch whisky imported during those years:

| Year | Wine gallons |
|------|-------------|
| 1934 | 2,132,235 |
| 1935 | 2,427,462 |
| 1936 | 5,860,746 |
| 1937 | 6,782,177 |
| 1938 | 6,662,045 |
| 1939 | 7,628,786 |

The foregoing amounts represent only the amounts withdrawn from customs custody from year to year and do not represent resales by importers.

The recession of 1938 did not materially affect the physical volume of sales and imports of Scotch nor Scotch whisky imports generally, and the decline in sales of Vat 69 in 1938 was caused only in a small part by the recession.

## Gin

During the base period years, under a license from Booth's Distilleries, Ltd., Distillers rectified, bottled, and distributed Booth's domestic High & Dry Gin. A similar arrangement was in effect with Booth's during a part of the base period pursuant to which Distillers also produced and supplied Import with another gin known as Booth's domestic Old Tom. DCL owned the controlling interest in Booth's Distilleries, Ltd.

Gin is 100 percent neutral spirits except for the botanicals which give it the taste and smell.

In 1939, the licensing agreement under which Distillers had been producing Booth's domestic High & Dry Gin was canceled. The reason for the cancellation was to avoid any possible risk that Booth's would be held to be doing business in the United States because of its supervision and control over such production. Thereafter, DCL established a plant in Linden, N.J., primarily for the production of Booth's domestic High & Dry Gin. In order to establish a sales volume for the Linden plant, DCL took away about 80 percent of the territory previously granted under the franchise-licensing agreement. The first such gin was produced at the Linden plant on or about February 14, 1939.

In an attempt to replace sales of Booth's domestic High & Dry Gin allocable to the lost territory, Import, in 1939, commenced the distribution of a new gin labeled "Park & Tilford London Dry Gin."

The sales of Booth's domestic High & Dry Gin and Park & Tilford London Dry Gin during the years 1936 through 1939 were as follows:

| Year | Booth's High & Dry Gin | | Park & Tilford London Dry Gin | |
|---|---|---|---|---|
| | Cases | Dollars | Cases | Dollars |
| 1936 | 41,963 | 406,600.97 | None | None |
| 1937 | 47,984 | 491,681.60 | None | None |
| 1938 | 34,601 | 380,882.61 | None | None |
| 1939 | 17,396 | 201,918.93 | 9,169 | 113,430.37 |

The following schedule indicates the gross profit percentages on Booth's domestic High & Dry Gin, P&T London Dry Gin, and private-label gins:

| Year | Booth's domestic High & Dry Gin | P&T London Dry Gin | Private-label gin |
|---|---|---|---|
| 1936 | 25.69 | ---- | 14.94 |
| 1937 | 18.26 | ---- | 12.44 |
| 1938 | 17.21 | ---- | 11.76 |
| 1939 | 18.33 | 12.32 | 10.66 |

## Issue 2

### Distillers

Set forth below, for each of the excess profits tax taxable years here involved, is Distiller's average base period net income computed pursuant to section 713(f) (without the application of sec. 722), its excess profits credit, and its excess profits net income:

| Year | ABPNI | Excess profits credit | Excess profits net income |
|---|---|---|---|
| 1940 | $122,842.34 | $116,700.22 | $129,434.00 |
| 1941 | 148,661.78 | 141,228.69 | 410,581.03 |
| 1942 | 148,661.78 | 141,228.69 | 430,512.21 |
| 1943 | 148,661.78 | 141,228.69 | 161,598.07 |
| 1944 | 148,661.78 | 141,228.69 | 525,399.70 |
| 1945 | 148,661.78 | 141,228.69 | 670,964.97 |

The following schedule shows Distillers' total net sales, gross profit from sales, and excess profits net income for each of the years 1934 to 1939, inclusive:

| Year | Net sales | Gross profit from sales | Excess profits net income |
|---|---|---|---|
| 1934 | $1,210,544.48 | $20,139.65 | $5,682.14 |
| 1935 | 2,215,112.79 | 28,136.13 | 16,812.06 |
| 1936 | 3,324,140.94 | 159,209.74 | 129,502.73 |
| 1937 | 4,073,004.36 | 173,274.18 | 144,764.70 |
| 1938 | 3,315,868.35 | 153,657.30 | 124,936.95 |
| 1939 | 4,182,479.22 | 215,224.37 | 164,364.54 |

Distillers is entitled to compute its excess profits credit under the average earnings method pursuant to section 713 of the 1939 Code.

Distillers' plant was located at 543 West 43d Street, New York, N.Y. From time to time Distillers entered into certain contracts with one or more independently owned distilleries for the production of whisky for its account. The distilled spirits acquired under such contracts were distilled in the name of Distillers under permits obtained by Distillers and allowed Distillers to label the whiskies thus distilled with the signature "Distilled by Park & Tilford Distillers, Inc.," or "Distilled and Bottled by Park & Tilford Distillers, Inc."

Both Import and Distillers purchased bulk whisky and held such whisky for aging. At all times up through the year 1943, all transfers of bulk whisky between members of the P&T Group were made at cost. In the case of intercompany transfers of bulk whisky by Kentucky, Kentucky's cost for the purpose of determining selling price did not include the expense incurred in storing whisky in its own warehouses. Kentucky transferred no bulk whisky during the base period.

With the exception of bottled-in-bond whisky, during the base period years here involved, Distillers sold its bottled products exclusively to Import, and Import purchased all of its bottled domestic whisky from Distillers. The price of such purchase of Distillers' entire output by Import was at cost to Distillers plus 5 percent. For this purpose, such cost did not include State excise taxes. The sales price for any given month was based on Distillers' cost of 2 months previous to billing date, i.e., Distillers' cost for October 1939 was the basis for billing December 1939 sales. Beginning with 1939, Distillers sold bottled-in-bond whisky which was bottled for its account by Frankfort Distilleries, Inc., to Kentucky for resale to Import and Missouri. Sales to Kentucky were at Distillers' cost plus 5 percent.

Distillers bottled for Import on the basis of current orders received. It had no inventories of cased goods at any time.

On some occasion during the peak demand seasons of 1936 and 1937, it became necessary to operate Distillers' bottling facilities for more than its regular 40-hour workweek in order to keep Import supplied with an adequate inventory of domestic cased goods. During the latter part of the year 1937, Distillers acquired new machinery and equipment which at least doubled its rectifying and bottling capacity. After such increase, Distillers had a capacity for the production of bottled goods of at least 2,800 cases per 8-hour day. This increased capacity existed throughout the balance of the base period and the excess profits tax years here involved.

*Issue 3*

Bonnie

Bonnie is entitled to compute its excess profits credit under the average earnings method set forth in section 713.

Bonnie's excess profits credits based upon invested capital, which were larger than its excess profits credits based on income, for each of the calendar years 1941 and 1942 were $5,956.83 and $3,302.84, respectively. Its excess profits net income (or loss) for the taxable years 1939 through 1942, as determined under either the income or invested capital method, were, respectively, ($173.52), ($3,511.83), $48,802.92, and $48,037.64.

Bonnie's invested capital was $500.

Bonnie's net income before taxes for each of the years 1941, 1942, and 1943 was $50,911.88, $48,037.64, and $865.34, respectively.

On October 7, 1938, under the name of Parkford Distillers, Inc., Bonnie purchased, at seller's cost, all the bulk whisky stock then owned by Bonnie Bros. (a corporation which had no relationship to Bonnie), comprising 9,021 barrels. The whisky was purchased for use by the P&T Group in P&T whiskies. The 9,021 barrels of whisky had been distilled in the spring of 1937. The aforementioned whisky was stored in warehouses, at Louisville, owned by Kentucky. Bonnie engaged in holding the said whisky for aging and sale.

Set forth below is the disposition ultimately made of the 9,021 barrels of whisky held by Bonnie:

| Date sold | Sold to— | Barrels | Sales price | Cost to date of sale | Gross profit |
|---|---|---|---|---|---|
| Jan. 30, 1941 | L. A. Heiss | 3,050 | $135,633.50 | $84,873.48 | $50,760.02 |
| June 4, 1941 | J. R. Hyde | 725 | 34,031.50 | 19,712.21 | 15,319.29 |
| July 2, 1941 | J. R. Hyde | 150 | 7,038.00 | 3,889.97 | 3,148.03 |
| 1942 | J. R. Hyde | 955 | 49,536.44 | 26,711.02 | 22,825.42 |
| 1942 | Waterfield & Co | 875 | 46,187.05 | 25,328.65 | 20,858.40 |
| 1942 | Robert Gould | 875 | 46,802.12 | 24,900.60 | 20,901.52 |
| | | 6,630 | 318,228.61 | 184,415.93 | 133,812.68 |
| *Intercompany transfers at cost for bottling* | | | | | |
| 1941 | | 50 | | | |
| 1942 | | 2,307 | | | |
| | | 8,987 | | | |
| On hand July 28, 1943 | | 334 | | | |
| Total on hand Dec. 31, 1939 | | 9,021 | | | |

Bonnie made no sales nor did it have any gross income from other sources during the base period. Its losses from operations for the

period from September 27 to December 31, 1938, and for the calendar year 1939 were ($1,597.82) and ($173.52), respectively. During the year 1939, salaries and wages and other cost-of-goods-sold items were added to the cost of inventory and are not included in the loss set forth above.

During 1943, Bonnie was liquidated and all of its assets were transferred to its sole stockholder, P&T, Inc. On July 28, 1943, Bonnie was dissolved.

## Issue 4

### Distillery

The excess profits credits based upon invested capital, the interest on borrowed capital, and the excess profits net income of Distillery for each of the excess profits tax taxable years here involved are set forth below:

| Year | Credit | Interest on borrowed capital | EPNI |
|------|--------|------------------------------|------|
| 1940 | $2,488.67 | $1,400.00 | ($23,193.64) |
| 1941 | 23,728.90 | None | (12,906.62) |
| 1942 | 33,677.60 | None | [1] 175,106.84 |
| 1943 | 41,362.39 | None | 227,098.63 |
| 1944 | 46,450.43 | None | 14,838.26 |
| 1945 | 56,126.70 | None | 221,149.98 |

[1] EPNI for 1942 before net operating loss deduction was $211,201.10.

Distillery is not entitled to use the excess profits credit based on income pursuant to section 713.

On or about September 6, 1940, pursuant to a contract of purchase and sale dated August 30, 1940, between Distillers and a receiver for Hamburger Distillery, Inc. (an independent corporation), Distillery acquired a distilling plant, a bottling plant, warehouses, and other tangible assets located at Brownsville, Pa. At the time of such acquisition both the distilling and bottling facilities located therein had been continuously idle for an extended period going back to the fall of 1937. At the time of acquisition, the distillery had a productive capacity of approximately 65,000 barrels per year; the bottling plant had a productive capacity of approximately 345,000 cases per year, and its storage capacity was approximately 63,000 barrels. These capacities remained unchanged throughout the years here involved.

Distillery's comparative closing balance sheets for each of the calendar years 1940 through 1945 are set forth below:

PARK & TILFORD DISTILLERY INC. (*) BALANCE SHEET AS OF DECEMBER 31ST OF THE YEAR INDICATED

| | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash | $15,337.98 | $34,131.17 | $70,865.97 | $222,451.11 | $113,157.11 | $169,735.27 |
| Accounts receivable—net | 11,701.91 | 28,819.69 | 219,455.51 | 188,287.21 | 440,638.24 | 16,170.74 |
| Inventories | 43,011.87 | 403,242.28 | 535,097.60 | 599,908.53 | 838,157.35 | 1,305,159.55 |
| Investments | | | | | 10,000.00 | 14,000.00 |
| Deferred charges | 14,508.59 | 13,067.81 | 10,886.40 | 20,979.22 | 14,561.86 | 63,564.36 |
| Capital assets—net | 119,812.50 | 116,438.50 | 113,063.50 | 117,523.60 | 209,100.57 | 216,064.85 |
| Total assets | 204,372.85 | 595,698.95 | 949,368.98 | 1,099,149.67 | 1,625,615.13 | 1,784,694.77 |
| **LIABILITIES** | | | | | | |
| Notes payable | 286,050.00 | 676,050.00 | 786,050.00 | 762,000.00 | 1,142,000.00 | 1,142,000.00 |
| Accounts payable | 8,649.84 | 31,985.47 | 32,503.01 | 115,182.96 | 272,130.83 | 216,422.16 |
| Accrued expense | 2,120.20 | 2,454.03 | 27,158.15 | 28,642.70 | 34,732.03 | 66,518.71 |
| Other liabilities (income taxes) | | | 117,259.76 | 206,374.97 | 46,168.52 | 146,870.56 |
| Total liabilities | 296,820.04 | 710,489.50 | 962,970.92 | 1,102,200.63 | 1,495,031.38 | 1,571,811.43 |
| **CAPITAL AND SURPLUS** | | | | | | |
| Capital stock: Common stock | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Surplus | (92,947.19) | (115,290.55) | (14,101.94) | (3,550.96) | 130,083.75 | 212,383.34 |
| Total capital and surplus | (92,447.19) | (114,790.55) | (13,601.94) | (3,050.96) | 130,583.75 | 212,883.34 |
| Add or deduct from capital surplus—Machinery, equipment, and fixtures:* | | | | | | |
| Gross cost | 86,542.30 | 108,643.85 | 102,965.90 | 114,315.37 | 189,307.67 | 156,562.81 |
| Less: Reserve for depreciation | 2,579.74 | 11,374.05 | 21,447.04 | 32,311.11 | 44,992.28 | 59,785.81 |
| Net cost | 83,962.56 | 97,269.80 | 81,518.86 | 82,004.26 | 94,315.39 | 96,777.00 |
| Total capital and surplus as adjusted herein | (8,484.63) | (17,520.75) | 67,916.92 | 78,953.30 | 224,899.14 | 309,660.34 |

* Per tax returns—Capital assets expensed on books—Recapitalized on tax return.

NOTE.—Parentheses denote red figure.

Upon acquisition of its plant on September 6, 1940, Distillery was warehousing whisky owned by others. This activity continued. In December 1940 it began distillation; in April 1941 it began blending, rectifying, and bottling. During the early part of 1942 it produced neutral spirits for its own use in blending and rectifying. In May 1942, the use of the distillery was requisitioned by the U.S. Government for the manufacture of alcohol for war purposes, which alcohol was then sold to the U.S. Government.

Set forth below are certain selected statistics relating to the operations of Distillery for the years 1940 through 1945, inclusive:

| Year | Whisky distillation barrels | Sales of cased goods | Sales of alcohol to Government |
|---|---|---|---|
| 1940 | 1, 486 | | |
| 1941 | 16, 909 | [1] $1, 068, 632. 81 | |
| 1942 | | [1] 3, 468, 019. 82 | $620, 294. 53 |
| 1943 | | [1] 4, 449, 582. 21 | 1, 217, 960. 68 |
| 1944 | 5, 198 | 6, 773, 621. 22 | 1, 225, 722. 70 |
| 1945 | 11, 051 | 9, 778, 990. 18 | 600, 504. 74 |

[1] Whisky for these cased goods was obtained from affiliates and such cased goods were sold to Import as in the instance of Distillers. The bulk whisky was transferred at cost and the case goods were sold at cost plus 5 percent.

The cost to Distillery of producing 16,909 barrels (821,295.20 original proof gallons) of spring 1941 rye whisky was $293,472.72 or $.3573 per O.P.G.

OPINION

*Issue 1*

Import

Section 722 (a) [7] requires Import to establish that the excess profits tax computed without the benefit of section 722 results in an excessive and discriminatory tax and to establish what would be a fair and just amount representing normal earnings to be used as a constructive

[7] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4), or the nature of the taxpayer and the character of its business under section 722 (c), to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

average base period net income. If Import satisfies these two requirements, then the statute provides that the tax shall be determined by using such constructive average base period net income in lieu of the actual average base period net income otherwise determined under the statute.

Import contends that it is entitled to relief under section 722(b)(4) [8] because there was a change in the character of its business because of a change in management, a change in operations, a difference in products furnished, and a difference in capacity for production or operation.

We conclude that Import qualifies for relief because it changed the character of its business during the base period years within the meaning of section 722(b)(4). The essential element of this change was the introduction of P&T Reserve, a neutral spirit blend whisky. This action brought about a "difference in the products" within the scope of subsection (b)(4).

P&T Reserve was a neutral spirit blend consisting of about 75 percent neutral spirits and about 25 percent whisky and was first introduced on or about February 25, 1935. Prior to that time no neutral spirit blend of whisky bearing the Park & Tilford name was sold by

---

[8] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, or substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, \* \* \*

Import. However, in December of 1934, an insignificant quantity of a private-label brand called Schulte De Luxe was produced and sold. P&T Reserve was produced and sold to minimize the loss in disposing of some 8,000 cases of Canadian whisky acquired prior to repeal. There was no promotion or advertising for P&T Reserve in 1935, and only a relatively small amount in 1936.

The decided cases involving the question of whether there is a difference in products within the meaning of (b)(4) have propounded various criteria. We have reached our conclusion by applying those criteria to the facts of this case.

1. Was the product in question accepted as different by the trade? *Stonhard Co.*, 13 T.C. 790 (1949); *Triangle Raincoat Co.*, 19 T.C. 548 (1952); *Charis Corporation*, 22 T.C. 191 (1954); *Davenport Hosiery Mills, Inc.*, 28 T.C. 201 (1957); sec. 35.722–3(d)(2), Regs. 112; and Bulletin on Section 722, p. 52.

Both before and after prohibition, opinion within the liquor industry was divided as to whether neutral spirit blends were a type of whisky suitable for the public taste or whether blending straight whisky with neutral spirits debased the product. Proponents of straight whiskies have referred contemptuously to spirit blends as "cut" or "imitation" whisky. Many distillers have never produced a spirit blend. Conversely, the largest distiller in the United States would, until recently, produce nothing but spirit blends. Spirit blends are distinguished by the industry in newspaper articles, in trade journals, in all advertising of industry products, in trade pricelists, and in monopoly-State listings. In the light of all the evidence, we have concluded that the trade regarded neutral spirit blends as a different class of product from straight whisky and blends of straight whisky.

2. Was the product in question sold to new customers and did it open new markets? *Stonhard Co., supra; Charis Corporation, supra; 7-Up Fort Worth Co.*, 8 T.C. 52 (1947); *Avey Drilling Machine Co.*, 16 T.C. 1281 (1951); *W. J. Voit Rubber Corp.*, 20 T.C. 84 (1953); *Triangle Raincoat Co., supra; Pelton & Crane Co.*, 20 T.C. 967 (1953); *Lamar Creamery Co.*, 8 T.C. 928 (1947); *Davenport Hosiery Mills, Inc., supra.*

Prior to prohibition, spirit blends accounted for two-thirds of the whisky consumption in the United States. As of repeal, spirit blends comprised 75 percent of domestic whisky consumption in the Eastern States and about 25 percent of the national consumption. During the base period years this market increased throughout the United States until it accounted for about 33 percent of the national whisky consumption. This potential market was unavailable to Import before the introduction of P&T Reserve.

In *Davenport Hosiery Mills, Inc., supra,* the introduction of nylon hosiery opened a new market which was separate and distinct from the market theretofore provided by silk hosiery products. At page 214, we said:

Respondent argues that the consumer market remained the same, namely, the American woman. It would seem that this is like saying television would not be a new product if sold to people who had bought radios. In our findings we have found that as to durability, washability, resilience, or shape-holding ability, appearance, and capacity for greater sheerness without loss of serviceability, the nylon stocking was a far better product than the silk stocking, and that it could be manufactured at only a slightly extra cost. That being so, it would seem that whereas comparatively few women could afford to keep themselves in fragile one-thread silk stockings that might not even last out one evening, a great many women could afford the very sheer nylon hosiery. Due to its inherent superior qualities, nylon hosiery was, therefore, salable to a much wider market.

In *Charis Corporation, supra,* we made the following findings of fact at page 193:

The Charis garments are more attractive to and more adaptable to the needs of a woman with a figure problem, one having a large or collapsed abdomen needing firm control. The Swavis garments were more attractive to the type of woman who has sufficient muscle tone so that her figure does not require the strong and definite control of the Charis garment.

There are more women in the class to whom the Swavis garment appeals than in the class who necessarily must use the garment of the Charis type. A woman who requires control of a large abdomen and smoothing out of figure line cannot wear an elastic-control garment which takes on the shape of the natural figure but wears a lacer-control garment to mold the figure and keep it contained.

which led to the conclusion at page 200:

The Swavis garment was a new garment designed primarily for an entirely different class of women from those using the Charis garment. * * *

* * * They do not have the same consumer market as they are not suited to the same type of women. One is used to mold the figure while the other is used to smooth out the dress line.

Similarly, we believe the market for spirit blends was as distinct as in *Davenport Hosiery Mills, Inc.,* and *Charis Corporation,* both *supra.* Cf. *Avey Drilling Machine Co., supra,* where only 40 new customers, who were in the same industries as those in which the taxpayer's old product was furnished, purchased the taxpayer's new product. In addition, P&T Reserve catered to different customers. It competed with different brands from those of Import's other products, i.e., straights and blends of straight whiskies.

In *W. J. Voit Rubber Corp., supra,* the taxpayer, who had previously manufactured all-rubber balls which were characterized as "play things," introduced a new product, "rubber-covered fabric carcass balls" of a quality and durability suitable for use in official

athletic contests. Respondent contended that there was no essential difference in the products, that the petitioner made footballs and basketballs prior to the base period, and that the fabric carcass balls were merely improved products of the same type, built for the same purpose and serving the same market. We denied respondent's contention and stated at page 93 :

We think the evidence establishes that the rubber-covered fabric carcass, inflated balls were a new product, made by different manufacturing methods, offered for sale in a different market and at a considerably higher price, and in competition with official athletic balls of other manufacturers not previously competitors, and that this new product materially affected the petitioner's earnings. * * *

This, of course, is a rather different situation from that in *ABC Brewing Corp.*, 20 T.C. 515 (1953), where it was held that beer made under a new formula was not a new product since it was sold in the same markets and was in competition with the same competitors. Moreover, it even competed with the beer previously manufactured by the taxpayer.

3. Was P&T Reserve merely an addition to Import's other lines? *Pelton & Crane Co.*, *Stonhard Co.*, and *Charis Corporation*, all *supra*. Was the new product merely an improvement? *W. J. Voit Rubber Corp.*, *Charis Corporation*, *Avey Drilling Machine Co.*, *Triangle Raincoat Co.*, *ABC Brewing Corp.*, *Davenport Hosiery Mills, Inc.*, all *supra; Permold Co.*, 21 T.C. 759 (1954).

We have concluded the answer to each question must be in the negative. P&T Reserve was not merely a technological improvement of the straight whiskies sold nor of the blends of straight whiskies. The neutral spirit blend was a different class of whisky, having its own consumer demand, its own chemistry, and its own economics of production and sale. There is as much difference between a neutral spirit blend and straight whisky or a blend of straights as there is between 7-Up and an orange drink, *7-Up Fort Worth Co.*, *supra;* silk and nylon hosiery, *Davenport Hosiery Mills, Inc.*, *supra;* leather-covered balls and rubber-covered balls, *W. J. Voit Rubber Corp.*, *supra;* and a plain turret lathe and a ram-type turret lathe, *Bardons & Oliver, Inc.*, 25 T.C. 504 (1955). Spirit blends contain a much smaller quantity of congenerics and thus are lighter in taste and odor than straight whisky. The technique of their manufacture is different from that of a straight or blend of straight whiskies.

The use of 75 percent neutral spirits in P&T Reserve permitted a greater volume of production during the shortages of aged whiskies. Furthermore the use of neutral spirits reduced the cost of the neutral spirit blends since neutral spirits did not have to be stored and aged. Thus P&T Reserve cost Import less than Import's other classes of

whiskies. The economics of the spirit blend market were different from those of straight whiskies or blends of straights, since the cost was less and the profit was higher.

Nor was Import constantly adding new lines. Throughout the base period years, Import had only three principal brands of domestic whisky: Private Stock, Kentucky Bred, and P&T Reserve.[9] P&T Reserve was not intended to replace any other brand distributed by Import, nor did it do so.

We hold that P&T Reserve constitutes a "difference in the products" as that term is used in section 722(b)(4).

We are satisfied that had P&T Reserve been introduced 2 years earlier its sales would have been substantially higher by the end of the base period. Accordingly, we have used our best judgment in arriving at a fair and just amount representing Import's normal earnings to be used as a CABPNI.

Import also contends that it is entitled to cost savings because of a change in the method of operations. Import contends that one of the most important changes in the character of its business was the change in relationship with suppliers of bulk whisky. Import contends that there were intercorporate arrangements between each member of the P&T Group, adopted by each member of the group, which provided for the transfer between members of bulk whisky at cost. Import contends that, because of the creation of Bonnie and Kentucky and the intercorporate relationships between it and Distillers and the aforementioned corporations, there became available to Import and Distillers bulk whisky at distiller's cost. These arrangements, Import contends, "were essentially contractual agreements" giving it and Distillers the right and power to call upon any or all of Bonnie's or Kentucky's whisky at this cost. Thus, Import argues it was placed in a position to secure the considerable cost savings based upon the difference between distiller's cost and the cost which it had to pay for bulk whisky in the open market, or pursuant to contract distilling as at Frankfort Distilleries, Inc. Import contends it had the right to call upon whatever bulk whisky was owned by members of the P&T Group. Import points out that these cost savings were not actually enjoyed by Import by the end of the base period, principally because of the substantial quantities of high-cost bulk whisky purchased from outsiders prior to the acquisition of Bonnie and Kentucky. However, these cost savings did become available after the close of the base period. Thus, Import contends a portion of its earnings during the excess profits tax years was attributable

---

[9] The private-label brands, which were not part of the Park & Tilford line, were short-lived with one exception, and their sales were insignificant.

to a change in the method of operations made during the base period, and a fair and just amount representing normal earnings must include the cost savings inherent in Distiller's cost to it. Otherwise, Import contends, there would be taxed as excess profits income which was in nowise attributable to the war economy.

We are unable to agree with Import's position. We do not believe Import changed its method of operation during the base period nor do we believe that there was any abnormality which should be corrected. Cf. *Southern California Edison Co.*, 19 T.C. 935, 996 (1953).

Essentially, Import is contending that it, Distillers, Bonnie, Distillery, and Kentucky, all separate corporations filing separate returns, should be treated as one because of some type of permanent contractual agreement between them. The evidence does not support any such contention. The record merely shows that all the aforementioned corporations were subsidiaries of P&T, Inc.; that Schulte, Stewart until his death, Handren, and Bernard operated the whisky business through these subsidiaries; that Distillers sold to Import at 5 percent over its cost, and bulk whisky was transferred between the corporations at cost. These facts, in our opinion, do not establish the existence of a permanent contractual arrangement. The policies under which these corporations were operated were informal and subject to change at any time. No subsidiary was committed to any other subsidiary to purchase or sell anything.

In an apparent effort to avoid exclusive reliance upon the informal "intercorporate arrangements" which were in effect at the end of Import's base period, Import argues that "Import and Distillers ceased purchasing bulk whisky from others than the P&T Group upon the acquisition of Bonnie and Kentucky." Even if outside purchases were actually cut off at this point, this would be of little benefit to Import because of the fact that Import did not actually make any use of the whisky during the base period. However, there is considerable doubt as to the accuracy of Import's assertion. Two of Import's witnesses testified that there were some large purchases of bulk whisky even after the organization of Bonnie and Kentucky.

It is true, as Import points out in its brief, that a change in the character of the business such as a change in the method of operations or a change in the capacity for operations can be accomplished not only by a change in the physical assets of the taxpayer or in the physical operations conducted by the taxpayer within its own business structure by its own personnel, *Neilson Lithographing Co.*, 19 T.C. 605 (1952); *Schneider's Modern Baking, Inc.*, 19 T.C. 763 (1953); *Brown Paper Mill Co.*, 23 T.C. 47 (1954); *Fanner Manufacturing Co.*, 29 T.C. 587 (1957); *Crowell-Collier Publishing Co.*, 25 T.C. 1268 (1956), but also by arrangements with others which change the

normal operating conditions of the taxpayer. *Wisconsin Farmer Co.*, 14 T.C. 1021 (1950); *Beringer Bros., Inc.*, 18 T.C. 615 (1952); *Flotill Products, Inc.*, 26 T.C. 222 (1956). Cf. *Irwin B. Schwabe Co.*, 12 T.C. 606 (1949); *Austin Co.*, 22 T.C. 703 (1954); *Santee River Hardwood Co.*, 26 T.C. 755 (1956). However, it is clear that Import does not come within the ambit of any of the aforementioned qualifying factors. Import did not change any operation of its own nor did it change its relationship with anyone else during the base period. The crux of Import's contention is that if Bonnie and Kentucky had come into existence 2 years earlier, or in September of 1931, they could have furnished whisky at cost to Distillers who in turn would have sold it to Import for 5 percent over Distillers' cost, and that by reason of all this, Import would have had a great savings in cost. The difficulty with such a position is that there is no warrant for it in section 722. There is no provision that allows one corporation to pass its *reconstructed* costs on to another corporation. The only way in which a taxpayer can take advantage of cost savings which are not actually realized during the base period is under the commitment rule under (b)(4). Cf. *Southern California Edison Co.*, *supra*, and *Bergstrom Paper Co.*, 26 T.C. 1167 (1956). But, there was no commitment in the instant case. Any (b)(4) change in the character of the business, other than a commitment, must have occurred immediately prior to or during the base period. *Corn Products Co.*, 36 T.C. 969 (1961); *Connecticut Light & Power Co.*, 40 T.C. 597 (1963). Here there is no base period event to support the claimed adjustment for cost savings relating to the proposed lower cost of whisky. There was in fact no cost savings available during the base period because Import made no changes.

The cases relied on by Import are distinguishable on their facts. In each case there was some change in the taxpayer's method of operation due to new physical equipment or new ways of handling its business because of the changed relationship with another. But, we have been cited no authority nor have we found any which allows one taxpayer to take advantage of a reconstruction by another taxpayer. A qualifying change can be pushed back to determine its CABPNI; however, there can be no pushback in order to qualify. Import, in fact, made no change in its method of operations during the base period which could be pushed back. The only way Import could obtain any relief on this basis would be to assume that *if* Bonnie and Kentucky had been in existence 2 years earlier, then Import could have derived cost savings. Since there was no qualifying factor and no abnormality which can be corrected, Import is not entitled to any cost savings. Cf. *Bardons & Oliver, Inc.*, *supra* at 512.

Import claims that it is entitled to relief under section 722(b)(2) because its business was depressed during the base period due to temporary economic circumstances unusual to it. To support its contention, Import relies on two factors. First, Import contends that there was an unexpected decrease in sales of Vat 69 Scotch. Import maintains that the reason for the reduction was the unevenness in the quality of the whisky occasioned by the lack of Scotch whisky available to the manufacturer for blending and the removal of the 8-year-old age label commencing with August 20, 1936. Because of supplies on hand, Import contends, the full effect of these adverse events was not apparent until 1938, when sales fell to 64,820 cases from the 150,-993 cases sold in 1937. Import asserts that by the end of 1939 the conditions which had caused the decline in sales of Vat 69 had been corrected, and sales were beginning to increase. That is, the age label was reaffixed to Vat 69 beginning with February 10, 1938, and by the beginning of 1939 the manufacturer was making available its finest Scotch whisky for use in Vat 69. Again, Import contends the supplies on hand prevented the effects of the change from being felt immediately. In addition, Import contends recovery of sales was hampered because, after the war broke out in Europe, shipments of Scotch by the manufacturer were limited. Second, it contends that in 1939 Booth's Distilleries undertook the distillation and bottling of Booth's domestic gins which had previously been distilled and bottled by Import and for which Import had been the exclusive American distributor. Subsequently, Import points out, its distribution territory was limited to a few Eastern States. To replace the loss of Booth's domestic gins, Import commenced the production and bottling of its own domestic gin in 1939. Import contends that by December 31, 1939, the sales of Park & Tilford Distilled London Dry Gin had not reached the volume to enable it to replace the sales which it lost of Booth's domestic gins.

Respondent contends that we have no jurisdiction to consider the Vat 69 issue because Import did not file a timely claim for relief. Respondent points out that the earliest of Import's basic applications for relief was filed on September 9, 1943, and other related applications and claims were filed in 1944, 1947, 1948, and 1949. Respondent also points out that no contention that Import should be granted relief under the provisions of section 722(b)(2) was ever mentioned until such a contention was first presented orally on March 17, 1950, and reduced to writing and presented to the Excess Profits Tax Council on April 21, 1950. Then on May 24, 1950, respondent points out, Import filed an amended application for relief. However, respondent contends that at that time the statute of limitations had run on the presentation of any new grounds for relief.

We do not agree with respondent.

There are two reasons why the statute of limitations does not bar a consideration of the Vat 69 claim. First, the procedural defects alleged by respondent are not statutory defects; they relate only to Import's nonconformance with the regulations. Section 722(d) requires only that applications for relief under section 722 be filed "within the period of time prescribed by section 322." This was done. The statute contains no requirement as to the statement of the grounds relied upon. Those requirements are set forth in the regulations, and those regulatory requirements can be waived by respondent. *Tucker* v. *Alexander*, 275 U.S. 228 (1927); *United States* v. *Memphis Cotton Oil Co.*, 288 U.S. 62 (1933); *United States* v. *Garbutt Oil Co.*, 302 U.S. 528 (1938); *United States* v. *Kales*, 314 U.S. 186 (1941); *Angelus Milling Co.* v. *Commissioner*, 325 U.S. 293 (1945); *Martin Weiner Corp.*, 26 T.C. 128, 134 (1956); *Hydraulic Press Manufacturing Co.*, 27 T.C. 278, 294 (1956); *Morgan Construction Co.*, 23 T.C. 242, 254 (1954). See *Eisenstadt Manufacturing Co.*, 28 T.C. 221, 233 (1957), *Columbia Broadcasting System, Inc. of California*, 32 T.C. 39, 40 (1959). In the instant case, respondent has raised the issue for the first time on brief; therefore, we hold that he waived any defect in the presentation of Import's claim. Second, aside from the question of waiver, where a taxpayer has established a qualifying event under section 722(b), the reconstruction of normal earnings must eliminate any abnormalities that existed during the base period. *Southern California Edison Co.*, supra, and *Bardons & Oliver, Inc.*, supra; E.P.C. 6, 1946–2 C.B. 123; E.P.C. 13, 1947–1 C.B. 83; E.P.C. 17, 1947–1 C.B. 90. Since Import has established a qualifying event, we must consider the issue of whether the decline in Vat 69 sales was an "abnormality" for which a reconstruction should be made.

In 1938, Sanderson wrote Import seeking an explanation as to why the sales of Vat 69 had declined. Handren wrote a memorandum listing the following six reasons:

(1) Removal of the eight-year old age statement from the label.
(2) Lack of uniformity in whiskey.
(3) Price cutting on competitive brands.
(4) Reduction of advertising budget.
(5) Decline of all Scotch whiskey sales, particularly the higher priced brands.
(6) The greater effect during this period of the so-called "fair trade" acts in America upon Vat 69 than upon the standard brands.

At the trial, Handren was of the opinion that removal of the age label and the "unevenness in quality" would have caused the decline in sales regardless of the other factors. We believe Handren's testimony to be little more than unsupported speculation.

The various conclusions advanced by Import are founded on the

basic assumption that the initial decline in Vat 69 sales was due exclusively to a loss of consumer confidence engendered by (1) removal of the 8-year-old age label and (2) an alleged temporary decline in the quality of the product. However, in our opinion based upon the entire record, Import has failed to prove that the decline in sales was due to anything other than the ordinary hazards and competitive forces of business.

It is extremely doubtful that the removal of the age legend could have been of any substantial independent importance. This change took place approximately a full year before the initial decline in sales first began to set in. This set of circumstances is to be contrasted with the reduction of advertising expenditures that went into effect during the last quarter of 1937.

There can be little doubt that Vat 69 sales suffered to a considerable extent from a general shift in consumer preferences toward lower priced spirits in all fields including that of Scotch whisky. Perhaps this factor had a more substantial impact on the sales of Vat 69 than would have otherwise been true if Import had not been faced with increasingly aggressive competition from other brands at the same time. However, the fact remains that significant increases were nonetheless being achieved by several other competitive brands.

Likewise, it may have been possible that Import received "off blend" whisky as it contends, but the record is completely barren of any evidence as to just when these shipments were received or in what quantities. Furthermore, even Import's economist stated that it was not unusual to end up with a bad batch of whisky. Such an occurrence appears, thus, to have been a normal business hazard.

The reduction in advertising in the last quarter of 1937, when coupled with other factors, appears to have had an adverse effect on Import's sales at a time when several of Import's important competitors in the Scotch whisky field were increasing substantially their promotional efforts. There is little doubt that Import's reduction of the total advertising expenditures on behalf of Vat 69 constituted a relatively permanent change. The reduction was directly occasioned by the intervening change in the status of its foreign supplier which took place about the middle of 1937 when Sanderson sold out to DCL. The influence of more intensive competition must certainly be regarded as being not only one of the "ordinary economic hazards to which business in general is subject" so as to fall outside the scope of section 722(b)(2) but also a perfectly normal development in all other respects. *Monarch Cap Screw & Manufacturing Co.*, 5 T.C. 1220, 1230 (1945); *Lamar Creamery Co., supra* at 939; *Permold Co., supra* at 768; *Hearn Department Stores, Inc.*, 23 T.C. 266, 284, 286 (1954); *Democrat Publishing Co.*, 26 T.C. 377, 382–383 (1956).

It would appear that the only material base period change ever made in the character of the basic whisky being used for Vat 69 took place within a relatively short time after January 17, 1938, as a direct result of Vat 69 becoming one of DCL's standard legends. The record is clear that Vat 69's acquisition of the status of a standard brand on or about January 17, 1938, came about as the direct result of the activities of Handren. Thus, so far as we can ascertain, the only base period change in the taste and color of Vat 69 was in reality occasioned thereby, and, therefore, it follows that no adverse consumer reaction flowing therefrom could properly be considered the result of an *economic* factor in the important sense of having been of purely *external* origin. See *Granite Construction Co.*, 19 T.C. 163, 170 (1952); *Hearn Department Stores, Inc.*, *supra* at 285–286; and *Empire Construction Co.*, 31 T.C. 857, 872–873 (1959).

The present record does not justify the conclusion that any Scotch whisky allocation program actually "hampered" the sales of favored high-priced standard brands such as Vat 69 during the last few months of 1939. Indeed, it would seem logical to infer that such a program could have had no more than an inconsequential influence on Vat 69 sales at any time during 1940 because DCL controlled from 80 to 85 percent of all the bulk stocks of whisky then on hand in Scotland and the combined total volume of all Scotch whiskies imported into this country continued to be at or near the 1939 peak until at least the end of the year 1941. Petitioner is presumably concerned about the implications, under such circumstances, of the clear record showing that, when no longer stimulated by the short-lived inventory boom of the last few months of 1939, Import's Vat 69 sales fell off rather substantially in 1940 to the point of being very little better for that year than they had been in 1938. There is no need to dwell on this latter point, however, because there had already been ample time by the end of 1939 for Vat 69 to begin to show at least some consequential improvement in relative competitive position, if it were ever going to do so under normal base period conditions. Cf. *Winter Paper Stock Co.*, 14 T.C. 1312, 1315, 1318–1320 (1950).

Accordingly, in determining Import's CABPNI, we have not taken into account the decline in sales of Vat 69.

Import has made no claim for relief because of any factor concerning Booth's High & Dry Gin. Accordingly, we have not considered any issue relating thereto.

*Issue 2*

Distillers

Distillers claims relief under the provisions of section 722(b)(4). To support its claim, Distillers contends that during or immediately

prior to the base period (1) there was an increase in its physical capacity for bottling and rectifying; (2) there was a new product, P&T Reserve, introduced; (3) there was an increase in capacity for operations through the introduction of a new product, P&T Reserve; and (4) there was a change in Distillers' management as a result of which the operation of Distillers' business was substantially changed.

With regard to Distillers' first contention, section 722(b)(4) provides that a "change in the character of the business" includes "a difference in the capacity for production." During the latter part of 1937, Distillers acquired new machinery and equipment which at least doubled its bottling and rectifying capacity. Therefore, Distillers has established that there was a "change in the character of the business" during the base period within the meaning of those words as used in section 722(b)(4).

The next question is whether Distillers' average base period net income is an inadequate standard of normal earnings because of the change in the character of the business. We believe the answer to this question must be in the negative.

Distillers alleged that its bottling capacity was taxed to meet the peak loads and demands of its sole market—Import—which sometimes resulted in breakdowns. This circumstance, Distillers contends, constituted a drain on its production facilities and resulted in overtime labor and increased costs. Distillers also contends that the increasing sales of P&T Reserve were hampered by its bottling capacity prior to the change.

Where a taxpayer seeks relief as a result of a base period increase in its physical capacity, it must establish that an inadequate physical capacity restricted its operations during at least some portion of the base period years. *Green Spring Dairy, Inc.*, 18 T.C. 217 (1952), modified 18 T.C. 929 (1952), affd. 208 F. 2d 471 (C.A. 4, 1953); *Lanzit Corrugated Box Co.*, 29 T.C. 330 (1957); see also *Columbia Tool Steel Co.*, 27 T.C. 70 (1956). The record before us fails to show any such limitation. There is no evidence that Distillers ever lost a single sale of bottled goods because of its bottling capacity. The increase in Distillers' capacity may have *permitted* an increase in its base period income but it did not *cause* any such increase. *Green Spring Dairy, Inc., supra; Lanzit Corrugated Box Co., supra*. The record indicates only that it became necessary to operate Distillers' bottling facilities for more than its regular 40-hour workweek on some occasions during the peak demand seasons of 1936 and 1937. While it is true that this circumstance may have increased Distillers' costs, it is also true that it increased Distillers' profits. Since Distillers sold its products at 5 percent above cost, the higher its costs, the higher its

income. Thus, any increase in capacity which tended to reduce costs correspondingly decreased Distillers' income.

Distillers' second and third contentions, in support of its claim for relief, are based on the argument that P&T Reserve was a new product to it. We do not agree.

Although Import and Distillers were both controlled by Schulte, they were separate and distinct corporations. The fact that P&T Reserve may have been a new product to Import is not conclusive as to P&T Reserve's relation to Distillers.

Distillers was organized for the primary purpose of blending and packaging distilled spirits in bottled form. The introduction of P&T Reserve did not open any new markets to Distillers, nor was it sold to new customers. *Stonhard Co., supra; Triangle Raincoat Co., supra; ABC Brewing Corp., supra.* Both before and after the introduction of P&T Reserve, Import was Distillers' sole market and customer.

Distillers' output was by no means confined to a single narrow field. It included at least one brandy, some cocktails, a variety of domestic whiskies produced by means of blending operations as well as otherwise, and certain gins whose production entailed the redistillation of neutral spirits, together with wine of both domestic and foreign origin. P&T Reserve fit into this preexisting line of products.

There was no essential difference in the nature of Distillers' operations before the introduction of P&T Reserve and that after its introduction. There is no evidence that Distillers acquired any new equipment at the time it first began producing P&T Reserve, and the blending operations required for the production thereof were presumably accomplished through the use of the same blending tanks which it had theretofore been using for the processing of gin, brandy, and the like. The present record thus contains no proof comparable to that which was supplied in *Davenport Hosiery Mills, Inc., supra,* where a special preboarding operation was found to be necessary for the production of the new nylon hosiery; or in *W. J. Voit Rubber Corp., supra,* where the new official-type athletic bulk involved the use of a fabric carcass which had not been employed in manufacturing the earlier all-rubber balls, and not only required additional manufacturing steps but also entailed the acquisition of new molding and cutting equipment.

We conclude that, as to Distillers, the introduction of P&T Reserve constituted a purely routine change in its operations that falls short of effecting a substantial departure from the preexisting nature of its business. See *Avey Drilling Machine Co., Triangle Raincoat Co., Permold Co.,* and *Austin Co.,* all *supra.*

As to Distillers' final contention, we are unable to find, on the record before us, that there was any change in Distillers' management which substantially changed the character of its business.

Accordingly, we hold that Distillers is entitled to no relief under section 722(b) (4).

## Issue 3

Bonnie claims that it is entitled to relief under section 722(b) (4) and (5). To support its claim under (b) (4), Bonnie points out that it was formed on October 7, 1938, and that it purchased 9,021 barrels of whisky distilled in the spring of 1937. Bonnie asserts that its sole function was to hold this whisky for aging and sale. Bonnie points out that except for 34 barrels on hand when it was liquidated in 1943, all of its whisky was either sold or transferred to outsiders or to other members of the P&T Group during the years 1941 and 1942. Therefore, Bonnie concludes that since it had no income whatsoever during the base period it qualifies for relief under (b) (4).

Bonnie relies on the following illustration from the Senate Finance Committee report to support its claim under (b) (5):

An example which your committee believes illustrates this paragraph [sec. 722(b) (5)] would be a taxpayer which shortly before the base period undertook a business involving the manufacture of a product requiring an extensive period for preparation or manufacture, and which had no stocks of such product on hand at the commencement of such business. Since a large portion of the base period would be devoted to preparation of the product for sale, and since sales would consequently be small or nonexistent and would not serve as a measure of the normal operations of the business, the base period would represent an abnormal standard by which to compute excess profits. Although in such a case, it might be said that the business was not depressed during the base period since it was operating at full manufacturing capacity, and thus might not be entitled to relief under paragraph 2, it would seem clear that such a taxpayer is entitled to relief by way of a constructive excess profits net income based upon more normal operations. For example, assume that a taxpayer was organized in 1935 to distill and sell whisky. It had no reserve whisky stocks on hand. During 1935 and for the greater part of its base period, it was aging the whisky it had distilled. Because of a lack of a marketable product, the sales of such taxpayer, and consequently its base period net income, were abnormally low and do not reflect results of usual operations. Relief should be extended to such taxpayer, the base period net income of which would not have been distorted if it had adequate whisky stocks on hand at the beginning of the base period. [S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 202, 203 (1942).]

We are unable to agree with Bonnie.

While it is true that commencement of business during the base period is specifically enumerated in section 722(b) (4) as a factor which could cause a taxpayer's average base period net income to be an inadequate standard of its normal earnings and thus result in an excessive and discriminatory tax, it is incumbent upon the taxpayer to show that this had a material effect on its earning capacity. The taxpayer must show a causal relationship between its commencement of busi-

ness and its earning capacity. This connection is not to be inferred from a mere showing that actual operations produced low earnings or no earnings during the base period. *Toledo Stove & Range Co.*, 16 T.C. 1125 (1951) ; *Union Parts Mfg. Co.*, 24 T.C. 775 (1955) ; *United Mail Order House*, 27 T.C. 534 (1956) ; *A. B. Farquhar Co.*, 28 T.C. 748 (1957) ; *Green Lumber Co.*, 32 T.C. 1050 (1959).

Bonnie's commencement of business during the base period did not cause its average base period net income to be an inadequate standard of normal earnings within the meaning of section 722(b)(4). The reason Bonnie failed to realize any earnings under the conditions which prevailed during the base period is to be found in (1) the fact that all of the one-and-only lot of 9,021 barrels of bulk whisky which it owned at any time during its entire corporate existence was purchased for use by the P&T Group in P&T whiskies and (2) the fact that under the intercompany practices, in effect at all times through the year 1943, of transferring bulk whisky from one member of the P&T Group to another, those transfers were made at prices equal to the seller's out-of-pocket cost.

The single lot of whisky which Bonnie acquired on October 7, 1938, had not attained an age of as much as 3 years by the end of the base period. None of the whisky being used for the production of any of the products which Import and Missouri were selling, in bottled form, during the last year of the base period was less than 3 years old, with the exception of certain insignificant quantities of certain private-label brands, but very large quantities of whiskies that had become 3 years old in time for inclusion in the formulas reflected in such bottled products were so used.

It is clear from the present record that the Bonnie whisky was not the only whisky that had been purchased for use by the P&T Group in P&T whiskies as of December 31, 1939. Handren testified that all the total combined bulk whisky inventory then being held by the P&T Group, which amounted to more than 130,000 barrels, that were at least 4 years old, had been acquired for such use and also specifically denied that the particular lot of 9,021 barrels of Bonnie whisky was purchased for any speculative purpose. It is equally clear that Import and Missouri were the only members of the P&T Group which ever made an outside sale at any time prior to the end of the base period, and that the only consequential outside sales of whisky in bulk form ever to be so made up through December 31, 1939, had been carried out under a special combination of extraordinary circumstances that could not possibly have been duplicated with respect to the Bonnie whisky in question.

The conditions which prevailed in the liquor industry at the time when Bonnie purchased its whisky at a distress price were far different from the conditions which had prevailed in the industry 2 years immediately prior thereto. At the same time, however, it is readily apparent from the nature of the closing 1939 bulk whisky inventory mentioned above that the particular price Bonnie might then have had to pay for a comparable lot of whisky which had already attained an age of approximately 1½ years, when so originally purchased, would not have had any effect upon the ultimate disposition thereof at any point up through the end of the base period under all the conditions actually prevailing within the P&T Group up to that point. Therefore, if Bonnie had, in fact, commenced business by purchasing its 9,021 barrels of whisky 2 years prior to the actual event, as contemplated by the 2-year pushback rule, it could not possibly have realized a profit from the sale thereof under the conditions which prevailed during the base period years.

Thus, if Bonnie's commencement of business were pushed back 2 years, there are only two things which could have happened to its 9,021 barrels of whisky. The whisky would either (1) still have been on hand in the consolidated closing inventory of the P&T Group along with all the other comparable whisky theretofore initially purchased for use by the P&T Group in P&T whiskies, or (2) have been previously transferred to another member of the P&T Group, at a price equal to Bonnie's cost, and actually used up in the production of P&T whiskies. Since Bonnie would, of course, have realized no profit whatever in either case, we conclude that its failure to have had more actual business experience as of the end of its base period did not cause its actual average base period net income to be an inadequate standard of normal earnings within the purview of section 722(b)(4). *Green Lumber Co., supra.*

Likewise, for the same reasons which we have heretofore stated, the situation responsible for the confinement of Bonnie's base period activities to the holding of bulk whisky for aging did not constitute any "other factor" of the character contemplated by section 722(b)(5). It is apparent that Bonnie's situtation during the base period differed from that of the hypothetical taxpayer described in the committee report, *supra.*

The most obvious of the aforementioned differences is the lack of any direct causal connection between the timing of Bonnie's commencement of business and its failure to realize any income during the base period. The cited example not only expressly assumes that the base period sales and net income of the hypothetical taxpayer described therein were abnormally low as a direct and proximate result of "a

lack of a marketable product" during the greater part of its base period, but also very clearly brings out that such abnormally low sales and net income did not "reflect the results of usual operations" for the particular kind of business, involving the distilling and aging of whisky *for sale at a profit*, being dealt with therein.

Affirmative proof of a direct cause-and-effect relationship between the particular factor being relied upon as a basis for the allowance of relief is specifically required in the case of both subsections (b)(4) and (b)(5). It is important to observe that all of the factors described in paragraphs (1) through (4) of subsection (b) have the common characteristic of requiring the requisite inadequate standard of normal earnings to be logically attributable to some definite event or action taking place prior to the end of the base period of the particular taxpayer concerned either because of its depressing effect on the usual and ordinary profits of such taxpayer or because it has made the realization of some income or greater income possible for the first time. The importance of this point resides in the fact that a basic condition to the allowance of any relief under subsection (b)(5) is that such relief must not be inconsistent with the basic underlying principles and conditions of section 722(b). *Alexandria Amusement Corporation*, 16 T.C. 446, 455 (1951); sec. 35.722–3(e), Regs. 112; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 202 (1942). This point is directly applicable here because the facts make it evident that nothing of any definite nature occurred, as of the end of Bonnie's base period, from which it would be possible to infer that continued operation at a loss was not a perfectly normal experience for its very narrow field of business activity.

Finally, the present record provides no valid evidentiary basis for determining the extent, if any, by which Bonnie's normal earnings were in excess of its actual earnings during the base period years. No consideration can be given to the eventual disposition of Bonnie's bulk whisky for the purpose of determining what would be a fair and just amount to be used as Bonnie's constructive average base period net income under section 722. This is true because of the express prohibition against a consideration of post base period data for such purpose. Section 722(a) specifically provides that "In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939."

Accordingly, we hold that Bonnie is not entitled to relief under section 722 (b)(4) or (b)(5).

*Issue 4*

Distillery

Distillery was not entitled to use an excess profits credit based on income, pursuant to section 713, because it came into existence after December 31, 1939. Distillery bases its claim for relief on section 722(c).[10] In general, section 722(c) provides that the tax shall be considered excessive and discriminatory if it can be shown that the excess profits credit based on invested capital is an inadequate standard because:

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,
(2) the business of the taxpayer is of a class in which capital is not an important income-producing factor, or
(3) the invested capital of the taxpayer is abnormally low.

The existence of one of the qualifying conditions is not sufficient to establish a right to relief under section 722(c) because the particular condition may not result in the invested capital method being an inadequate standard or it may be more than outweighed by other unusual war conditions operating to the taxpayer's advantage during the taxable years. *Danco Co.*, 14 T.C. 276 (1950). It is incumbent upon the taxpayer to demonstrate the inadequacy of its excess profits credit based on invested capital by showing that the inadequacy results from one of the foregoing factors and by establishing a fair and just amount representing normal earnings to be used as a CABPNI.

Distillery's first argument relates to section 722(c)(1). It is Distillery's position that its business was of a class in which intangible assets not includable in equity invested capital under section 718 made important contributions to income, and its equity invested capital was abnormally low. To support this position, Distillery argues that

---

[10] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,
(2) the business of the taxpayer is of a class in which capital is not an important income-producing factor, or
(3) the invested capital of the taxpayer is abnormally low.

In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a). For the purposes of section 713(g) and section 743, the beginning of the taxpayer's first taxable year under this subchapter shall be considered to be that date after which capital additions and capital reductions were not taken into account for the purposes of this subsection.

its membership in the P&T Group made available to it the experience, know-how, and skilled organization and status in the liquor industry of the P&T Group. Distillery alleges that it had a source of financing not only for its capital purchases but also for its current operations. In addition, Distillery asserts it had a ready outlet for its production to members of the P&T Group. Further, Distillery states that it was granted certain distribution rights by Pennsylvania because of its location within the State. Most important, Distillery contends that it commenced business with an established goodwill because it had the use of the Park & Tilford name and reputation. Distillery contends that all of the foregoing were intangible assets which made important contributions to its income.

We are unable to agree with Distillery's position.

The present record falls far short of demonstrating that any one or any combination of the factors relied upon by Distillery was an intangible asset which made "important contributions to income." We have held that the mere successful operation of a business through efficient management and competent personnel does not establish the existence of a qualifying factor under (c) (1). *North Fort Worth State Bank*, 22 T.C. 539 (1954); *Crestwood Publishing Co.*, 29 T.C. 789 (1958). In both of the aforementioned cases, it was conceded that the taxpayer's management was capable and experienced, but in each case we denied relief because of the taxpayer's failure to show that its management was in any way superior to that of companies generally in the same line of business. We can make the same observation in this case. Distillery has not demonstrated that its managment contributed any more to the production of income than ordinary, efficient management is expected to contribute.

This case is distinguishable from *Danco Co., supra*, upon which Distillery relies. In that case, it was shown that the contacts, reputation, and technical attributes of one of the taxpayer's officers were responsible for the immediate flow of business to the taxpayer. The taxpayer was in the business of fabricating sheet metal to customers' specifications. We found that "petitioner was not simply manufacturing and selling an article. In conducting a customs business, it was performing a service in accordance with the specifications outlined by its customers." It is easily understandable, in an organization conducting a customs service such as in *Danco Co., supra*, that the personal and technical reputation of a principal in the organization could be a valuable asset to an organization. See also *Jackson-Raymond Co.*, 23 T.C. 826 (1955); *Avildsen Tools & Machines, Inc.*, 26 T.C. 1127 (1956). Here, Distillery was "simply manufacturing and selling an article" and there is no evidence that the personal touch of its officers was employed to gain customers or income. We, there-

fore, conclude that the attributes of Distillery's officers were not such that they constituted intangible assets within the meaning of (c) (1).

Distillery contends that to claim its membership in the P&T Group was not an intangible asset which contributed to its income is "to completely ignore the fact that it actually did earn income during the excess profits tax years and this income was due in large part to its membership in the P&T Group with its attendant advantages of reputation, experienced management and financing." The difficulty with Distillery's contention is that it assumes the issue we are trying to decide. If this contention had merit, any corporation that began business after December 31, 1939, and made a profit could qualify for relief under (c) (1). Obviously, Congress never intended such a situation to exist.

Insofar as the P&T Group being a ready outlet for Distillery's products is concerned, we do not consider this factor as constituting an intangible asset. If we assume that the "intercompany arrangement" of selling bulk whisky at cost is bona fide, then this would seem to be in the nature of a *tangible liability* rather than an intangible asset since no profit could obtain from such an "outlet."

As for the "certain distribution rights" granted by Pennsylvania, there is no evidence as to what these were, much less how they in any way made important contributions to Distillery's income. The sole basis for this contention is a statement in the record by Handren to that effect. There was no elaboration as to what the rights might have been.

In analyzing the possible advantages Distillery might derive from using the Park & Tilford name, we have considerable difficulty in determining exactly what function Distillery was to carry on. At times it is contended that Distillery was formed as part of a master plan to obtain whisky at cost for the P&T Group. At other times, it is contended that Bonnie and Kentucky were able to supply all of Import's needs and consequently Distillery was free to make sales to outsiders. Under either of these alternatives, it is difficult to see how Distillery could have been in a position to derive any substantial benefit from its use of the Park & Tilford name.

If Distillery's function was to produce only for the P&T Group, it is obvious that it could derive no benefit from the name. On the other hand, if some portion of the whisky were to be sold to outsiders, we cannot foresee any substantial benefits to be derived. None of the whiskies that any of the other members of the P&T Group had sold to the general public at any time prior to the organization of Distillery or that had been distilled by any company making use of the Park & Tilford name had ever been held out to the public as products of the State of Pennsylvania. While it is true that some of the whisky dis-

tilled in the Bernheim and Frankfort distilleries for the account of Distillers may have been held out to the public as Kentucky and Maryland whisky produced by a company making use of the Park & Tilford name, in connection with the sale of case goods by Import and Missouri, the record does not even indicate the extent to which this occurred. The record does indicate that a part of the whisky acquired under the contracts with Frankfort was used along with other whiskies, including Canadian whiskies, in the production of P&T Reserve so that in this important instance at least, it would not have been feasible to make reference to the names of the companies actually distilling any of the whiskies used therein in connection with the sale thereof.

The situation here is quite different from *Danco Co.*, *supra*, where it was shown that the extensive technical skill and ability, established reputation for quality workmanship, and valuable contacts with the trade played an important part in the taxpayer's procurement of income. There was direct, affirmative evidence that customers purchased from Danco Co. because of the reputation and skill of the taxpayer's officer. This is to be sharply contrasted with the record in this case which is barren of any evidence even remotely suggesting that Distillery was able to sell as much as an ounce of whisky because its corporate name was Park & Tilford Distillery, Inc.

Distillery attempts to distinguish *Crestwood Publishing Co.*, *supra*, on the ground that the taxpayer involved therein was not the successor of any prior enterprise; but, in a very real sense, the same thing is also true here because Distillery was engaged in activities which, although similar to the activities being carried on by Kentucky, were undertaken at a time when none of Kentucky's products had ever been sold to the general public or, for that matter, to any of the other members of the P&T Group. It is important to note that the kind of product which Distillery was organized to produce has not been shown to have been materially different from the kind of product which its nonaffiliated predecessor, Hamburger Distillery Co., had apparently been unable to sell at a profit under base period conditions. The mere fact that Distillery's production was of the same generic class as the previous production of an affiliated company that had actually been carried out at a different location and with different equipment certainly does not establish the presence of a qualifying factor under section 722(c)(1). *Springfield Plywood Corporation*, 18 T.C. 17 (1952).

Based on the record before us, we hold Distillery is not entitled to relief under (c)(1).

In support of its contention that it qualifies for relief under (c)(3), Distillery points out that its equity capital was only $500; that it had

no earnings during 1942; did not receive the benefit of any earnings and profits in its invested capital credit until 1943; and that the largest portion of the foregoing invested capital credit resulted from notes payable on which no interest was paid, except for a small amount in 1940. Distillery contends that its ratio of paid-in capital to borrowed capital varies enormously from that of certain distillers, set forth in an exhibit presented by Distillery,[11] in the liquor industry during the years 1940 through 1946. Distillery asserts that it is abnormal for a ratio of borrowed capital to paid-in capital to range from 572:1 in 1940 to 1352:1 in 1941 and 1572:1 in 1942. Furthermore, Distillery contends it is abnormal for a corporation acquiring a plant at a contract price of $217,173.77 and requiring further working capital, to be capitalized with an equity of $500. It is asserted that the only basis for such a set of facts could occur because of the relationship of Distillery as a wholly owned subsidiary of the P&T Group.

Distillery contends it was only enabled to operate because of large borrowings from other members of the P&T Group which were in lieu of a normal capitalization. Distillery points out the Bulletin on Section 722, p. 134, states that invested capital may be abnormally low because of:

(1) An invested capital which as a whole is abnormally low in dollar amount relative to the size of the business done; or

(2) A substantial maldistribution of capital between equity invested capital and borrowed capital which results in abnormally low invested capital; or

(3) A combination of the above factors resulting in an abnormally low invested capital.

---

[11] The following schedule was presented by Distillery comparing the ratio of paid-in capital to borrowed capital of the several companies listed below:

| | 1936 | 1937 | 1938 |
|---|---|---|---|
| The American Distilling Co. | 1 to 2.52 | 1 to 2.86 | 1 to 2.48. |
| Franklin County Distilling Co. | 3.21 to 1 | 1 to 1.72 | 1 to 2.09. |
| Merchants Distilling Corp. | 1.82 to 1 | 1 to 1.20 | 1 to 2.21. |
| Mohawk Liqueur Corp. | 3.90 to 1 | 3.91 to 1 | 6.17 to 1. |
| Tom Moore Distilling Co. | 2.04 to 1 | 1.08 to 1 | |
| Brown Forman Distillery Co. | | 1.06 to 1 | 1.07 to 1. |

| | 1939 | 1940 | 1941 | 1942 |
|---|---|---|---|---|
| The American Distilling Co. | 1 to 2.40 | 1 to 2.45 | 1 to 2.82 | 3.17 to 1. |
| Franklin County Distilling Co. | 1 to 2.08 | | 2.11 to 1 | |
| Merchants Distilling Corp. | 1 to 2.61 | 1 to 3.45 | 1 to 3.92 | 1 to 4.58. |
| Mohawk Liqueur Corp. | 7.26 to 1 | 3.95 to 1 | 2.06 to 1 | 1 to 1.16. |
| Brown Forman Distillery Co. | 1.26 to 1 | 1.12 to 1 | 1 to 1.02 | 1 to 1.63. |
| Distillery | | 1 to 572.0 | 1 to 1352.0 | 1 to 1572.0. |

Also, Distillery points out that E.P.C. 35, 1949–1 C.B. 135–6, provides that:

It is sufficient if the abnormality is established by analysis of the circumstances affecting the taxpayer's own invested capital, although comparisons with other corporations may be used. For example, the fact that invested capital is abnormally low might be established by showing an abnormally high ratio of borrowed capital to total invested capital * * *

Distillery claims it could operate with its peculiar capitalization only because of its membership in the P&T Group. This, Distillery contends, does not change the fact that there is a substantial maldistribution of capital between its equity invested capital and borrowed capital, and that its invested capital credit is not a fair reflection of normal earnings.

We are unable to agree with Distillery.

Distillery has called special attention to the fact that its total "equity invested capital" amounted to only $500. However, the term "invested capital" is used in section 722(c)(3). The term "invested capital" as used in section 722(c)(3) means invested capital as determined under the Code for excess profits purposes. *Springfield Plywood Corporation, supra.* "Invested capital" includes, among other things, "borrowed invested capital." See secs. 715 through 719. It is, thus, the combined amount of both types of invested capital which must be shown to be abnormally low in order to make out a case for relief under section 722(c)(3).

Distillery was not subjected to an excessive and discriminatory excess profits tax for any reason in either 1940 or 1941 because it operated at a loss in both of such years. Since Distillery's excess profits credit as determined on the invested capital basis amounted to $33,677.60 for the year 1942, there can be no doubt that it had acquired a very substantial amount of borrowed invested capital before ever beginning to realize any income. By the same token, the fact that the average amount of its total invested capital thereafter increased by further substantial amounts in the subsequent excess profits tax years 1943, 1944, and 1945 can be adequately demonstrated by reference to its invested capital credits for such years. Such credits were $41,362.39, $46,450.43, and $56,126.70, respectively.

Distillery has advanced no claim that it did not have enough total capital available to conduct its operations in a perfectly normal manner. This situation is of special importance because of the stipulated fact that Distillery paid out no interest whatever on its borrowed capital for any of the taxable years 1941 to 1945, inclusive. Distillery's access to an abundant supply of borrowed capital on which it was not required to pay any interest deserves special consideration because such borrowed capital was thus, in that respect, very much like

the equity capital of the group of 10 independently operated distilling corporations for which the record includes summary balance sheet data as compiled from reports filed with the Securities and Exchange Commission. A major flaw in this argument is that the companies to which Distillery compares its equity capital were all operated on an independent and self-sufficient basis, and are, thus, not comparable to Distillery. *Springfield Plywood Corporation, supra.*

The record indicates that there were at least some other corporations in the liquor industry which were operated on a nonindependent basis in conjunction with several other affiliated corporations having interrelationships that were similar to those which obtained within the P&T Group. However, the record contains no information whatever with respect to the capital structure of any such nonindependent members of the liquor industry. We must conclude that Distillery has failed to establish that its invested capital structure differed in any material respect from the normal or usual capital structure of other comparable members of its industry for any special or peculiar reason which might justify the conclusion that its invested capital was abnormally low. *Gulf Distilling Corporation,* 33 T.C. 367 (1959).

The disparity between borrowed capital and equity capital might be a consideration leading to a finding that Distillery's invested capital was abnormally low. However, Distillery is required further to show that this disparity represented a substantial departure from the usual invested capital structure of other comparable members of the industry. What was said in *Gulf Distilling Corporation, supra* at 378, seems pertinent here:

Petitioner argues that the operation of an industrial alcohol plant necessarily involves a large capital investment, a fact evidenced by the need for a complicated plant, a large inventory of supplies, and the ability to carry customers during credit periods. It submits that the fact that it was able to achieve the operation which it did on a stock investment of $58,863.01 in its first excess profits tax year, and $95,000 in its two succeeding excess profits tax years, while enjoying sales of $3,056,240.38, $7,310,672.52 and $8,152,734.20 in each of those years, respectively, adequately demonstrates that its "situation is by its very nature inherently and highly abnormal."

The immediate fault with this argument is that it assumes the very thing it is designed to prove; i.e., that an industrial alcohol producer similar to the petitioner would normally require a capital stock investment substantially in excess of that maintained by the petitioner. What we said in *Metal Hose & Tubing Co., supra,* seems particularly appropriate here:

Under EPC 35, the problems of the norms of the ratio of borrowed capital to total invested capital, or possibly the norms of the turnover of capital in sales, are merely substituted for the problem of ascertaining when invested capital is abnormally low.

Or, stated differently, the test is an objective one; that is to say, the taxpayer must establish what is normal, before concluding that its own case is abnormal. Proof of the various items which comprise its own invested capital thus is only

part of the burden. Moreover, the fact that petitioner was able to operate so successfully on the capital structure which it had tends to prove that its capital was adequate for the type of operation which was conducted. Finally it should be noted that "money paid in for stock" (the $58,000 and $95,000 figures used in petitioner's above argument) is only one of five items which go to make up its statutorily defined invested capital, which during the years in issue, was $461,787.86, $639,057.69, and $764,017.44, respectively.

In the final analysis, it is evident that the absence of any specific information with respect to whether or not it was a normal practice in the liquor industry for nonindependent corporations like Distillery to operate primarily on capital supplied by their affiliates on an interest-free loan basis would necessarily make it impossible to conclude that Distillery's total invested capital can properly be described as "abnormally" low within the meaning of section 722(c). See *Springfield Plywood Corporation, supra* at 28–31. Accordingly we hold that Distillery is entitled to no relief under section 722(c) (1) or (3).

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*